859 A.2d 313

**Scott B. GOLDSTEIN, Esq. et al.**

v.

**Stephen L. MILES, Esq.**

**No. 232, Sept. Term, 2003.**

Court of Special Appeals of Maryland.

Oct. 8, 2004.

Mark T. Mixter (Mixter & Oliveri, on the brief), Baltimore, for appellant.

Severn E.S. Miller (Thomas & Libowitz, PA, on the brief), Baltimore, for appellee.

Panel: ADKINS, KRAUSER, and THEODORE G., BLOOM (Retired, specially assigned), JJ.

KRAUSER, Judge.

In this case, tort and contract law converge to produce a tort claim for fraud and negligent misrepresentation coupled with a demand for contract damages, a conceptual composite recognized by Maryland law.[1] To assure that this hybrid is not used as a device to obtain contract damages where no enforceable promise or agreement exists or as a means to circumvent standard contract defenses, we join other jurisdictions today in holding that benefit-of-the-bargain damages are obtainable for such tortious conduct but only where there is in fact an enforceable bargain. The failure of appellants to allege, much less to produce, sufficient evidence of that, is fatal to their claim, leading us to conclude, for this and other reasons, that the circuit court did not err in granting summary judgment in favor of appellee.

The tort claim of which we speak was brought by former employees of the Law Offices of Stephen L. Miles,[2] appellants Scott B. Goldstein, Esquire, and James K. MacAlister, Esquire. Relying upon the representations of appellee, Steven L. Miles, that he would sell his law firm to them when he retired, both men claim that they turned down other employment opportunities to stay with Miles's firm. When Miles chose instead to sell his practice to the law firm of Saiontz &

---

1. *See, e.g., Hinkle v. Rockville Motor Co.,* 262 Md. 502, 278 A.2d 42 (1971); *see also Downs v. Reighard,* 265 Md. 344, 289 A.2d 299 (1972); *Hall v. Lovell Regency Homes Ltd. P'ship,* 121 Md.App. 1, 708 A.2d 344 (1998); *Ward Dev. Co. v. Ingrao,* 63 Md.App. 645, 493 A.2d 421 (1985); *Aeropesca Ltd. v. Butler Aviation Int'l, Inc.,* 44 Md.App. 610, 411 A.2d 1055 (1980).

2. Although the parties refer to Miles's firm as the Law Offices of Stephen L. Miles, the Maryland State Department of Assessments and Taxation lists the practice as Stephen L. Miles, P.A.

Kirk, P.A.,[3] Goldstein and MacAlister filed suit in the Circuit Court for Baltimore County, accusing him of fraud and negligent misrepresentation and requesting lost profits and benefit-of-the-bargain damages.

Claiming that there was no evidence of any actionable promises, reasonable reliance, fraudulent intent, or actual damages, Miles moved for summary judgment as to both counts. The circuit court granted that motion, ruling that appellants had failed to produce sufficient evidence that they had ever struck a "bargain" with Miles to purchase his practice.

Requesting reconsideration of that decision, Goldstein and MacAlister submitted, among other things, the affidavit of Bruce D. Block, an attorney who, at one point, had considered purchasing the firm with Goldstein. The effect of that submission, however, was to convince the court that appellants had little cause to have brought the fraud and negligent misrepresentation claims in the first place: the affidavit flatly contradicted representations made by appellants at the summary judgment hearing concerning a statement Miles purportedly made to Block.

At that hearing, Goldstein and MacAlister represented to the court that Miles had told Block that he never intended to sell his practice to Goldstein and MacAlister. That statement conflicted with the Block affidavit that Goldstein and Miles subsequently produced at the reconsideration hearing. The affidavit stated that what Miles actually said to Block was that "he would not sell his law firm to Scott Goldstein, alone, due to the fact that [he] did not perceive that Mr. Goldstein had the financial backing or wherewithall [sic] to permit him to purchase the law firm." After reaffirming its earlier decision that Miles was entitled to summary judgment on the benefit-of-the-bargain issue, the court then declared that it was granting

---

**3.** The two law firms actually merged, but we shall refer to it as a sale because the parties do.

"Summary Judgment ... in favor of [Miles] on all counts and all issues."

From that decision, Goldstein and MacAlister noted this appeal. Despite the circuit court's pronouncement that it was granting summary judgment as to "all counts and all issues," Goldstein and MacAlister mischaracterize the court's ruling in their brief by stating, "the trial court properly determined that there were sufficient issues of fact on the issues of liability to submit this case to a jury." Consistent with this misdescription of the circuit court's holding, they present only one question for our review, and that question appears to focus principally, as does their argument, on whether there was sufficient evidence of benefit-of-the-bargain damages to survive a summary judgment motion. They frame that question as follows:

> Did the trial court, by granting Appellee's Motion For Summary Judgment and subsequently denying Appellants' Motion for Reconsideration, abuse its discretion under Rules 2–501, 2–534, and 2–535 and improperly interpret the facts and law regarding the proper assessment of damages arising from ... properly presented and supported counts in fraud and negligent misrepresentation, when it determined that Appellants' theories of damages, including "benefit of the bargain[,"] were not properly presentable to the trier of fact?

In the course of presenting their argument, however, appellants do touch upon whether Miles made actionable promises and whether they reasonably relied upon them by reciting the facts as they believed the evidence presented them. They did not, however, submit a reply brief though these issues were fully developed and presented in Miles's brief.

## FACTS

The parties present a farrago of facts. Their frequent inability to assign dates to the very statements or actions upon which the principal claims rest, or even, at times, to establish a comprehensible sequence of events, has required us to

engage in a painstaking review of the record. Complicating matters further, appellants have lumped together material and, according to appellants, false representations that Miles purportedly made, at different times, to different combinations of potential purchasers, to presumably create the impression that all of the alleged misrepresentations are relevant to their claim. Only some are.

In reviewing the facts below, one must keep in mind that, during the roughly fifteen year period they cover, there were at least four different sets of potential buyers: (1) Goldstein and MacAlister; (2) Goldstein and Tom Bernier; (3) Goldstein, MacAlister, and Bernier; and (4) Goldstein and Bruce D. Block. But, for the purposes of this appeal, the only relevant purchasing unit is Goldstein and MacAlister. They are the ones who brought this suit and now this appeal. Consequently, the only representations that are material to the claims of fraud and negligent misrepresentation now before us are those that are relevant to the attempt of Goldstein and MacAlister to buy the firm together. With this in mind, we now turn to the facts of this case as presented in the pleadings, the depositions, and the affidavits submitted both in support of and in opposition to appellee's motion for summary judgment.

Miles's law firm, the Law Offices of Stephen L. Miles, concentrated in personal injury law. Miles marketed his firm by appearing in television commercials, and the firm prospered. In 1985, Goldstein joined Miles's firm as an associate. When he interviewed for that position, Miles told him, "If it worked out to be a marriage between [them], [his] future would be very bright."

As time passed, Miles began to spend, according to Goldstein, "less and less time in the practice," while Goldstein's "level of responsibility and [his] commitment to the practice in the form of hours and obligations ... drastically increas[ed]." Goldstein maintained that he was largely responsible for managing the firm, and generally worked sixty or seventy hours per week. Consistent with his growing responsibilities, Gold-

stein's salary increased during his employment with Miles, reaching a high of $198,000 in 1994 or 1995.[4]

Goldstein stated that, in 1997, Miles promised to pay him a salary of at least $200,000 that year, but did not. Instead, Miles paid him a salary of $166,000.

On several occasions, Miles discussed with Goldstein agreements that the two might enter regarding the practice, in the event that Miles died while Goldstein was still with the firm. In 1985 or 1986, Miles expressed the wish to enter into a "contingent death agreement," providing that, upon his death, Goldstein and another associate would have the opportunity to purchase the law firm from his estate. Although a written agreement was drafted, it was never signed because, according to Goldstein, "Miles was [not] satisfied with the final draft." In 1989 "Miles proposed the drafting and the execution of what he referred to as a nonequity partnership agreement," Goldstein stated. Although drafted, that agreement was also never executed.

Miles stated, according to Goldstein, that the firm "would be sold to [him] as an acknowledgment of [his] longevity and [his] commitment to the practice[,] for less than what was otherwise perceived to be the market value." Miles promised, he asserted, that Miles would sell the practice to him "on the terms that he knew that [Goldstein] could afford and make."

Describing the understanding he purportedly had with Miles, Goldstein stated:

> Mr. Miles ... regularly told me that we would hire an appraiser who would come in and would appraise the belongings of the practice ... the furniture or whatever there was, that we would agree on a payout for that, that ... we would agree on a percentage of the fees to be paid to him, that we would have to agree to affix a number for the good will, that he would take back the financing on the ... practice because he knew ... that I wouldn't be able to ...

---

4. Goldstein testified that he was unsure whether he earned that amount in 1994 or 1995.

go out and borrow the kind of money necessary, so that he would hold the financing on it because what he was primarily interested in achieving from the sale of the practice was a stream of income. . . .

But Goldstein acknowledged that the deal was also always contingent on Goldstein purchasing the firm with a partner acceptable to Miles. Even when he insisted that Miles "had essentially already guaranteed to [him] by 1993 that the practice would be [his]," he added, "along with co-participants." Because Miles anticipated that any deal he might strike with Goldstein and MacAlister would require that the purchase price be paid over time, the continued profitability of the firm was of vital importance to him. He therefore stressed that he would only sell to Goldstein if another lawyer, acceptable to him, purchased the practice with Goldstein. To that end, Miles directed Goldstein "to go out to identify a potential [partner] or to identify a person to come in." The plan, according to Goldstein, was that "that person would come in and they would work as an associate." He explained that, "if it proved to be a marriage, as [Miles] call[ed] it, then that person would have an opportunity to have a nonequity type of profit sharing position. And then ultimately [Miles] would sell th[e] practice . . . to [Goldstein] and that individual."

Over the course of Goldstein's employment with Miles, "a series of individuals . . . were brought in with that intention." But these individuals were ultimately either rejected by Miles as potential partners for Goldstein or they left Miles's firm to pursue other employment opportunities.

Goldstein acknowledged that, as of 1993, the specific terms of the sale had not been agreed upon:

[T]here were not a lot of stone cold specifics that had been agreed upon. It was more a format, an outline within which the acquisition of the firm was to occur. There were certain things that were hard and fast. . . . That he absolutely would take back the financing, that he recognized that I would have to pay him off over a period of time, that he

wanted to have someone else involved in the practice in addition to myself.

. . . .

It was agreed that he would be paid his money over an installment period of time so that he would have an income generated. It was agreed that he would make himself available to assist in the marketing of the law firm by performing on commercials.

Those are things that were clearly essential elements of the deal.

During his employment with Miles, Goldstein believed he did everything Miles asked of him in connection with the practice:

I did everything that this man asked me to do and exceeded that over a period of 15 years. I couldn't have been more committed. And despite my efforts, my undying efforts, and despite the fact that I sat down and made a significant effort to negotiate with Mr. Miles in good faith, Mr. Miles refused to sell me the firm and Mr. Miles specifically misled me as far as his negotiations with other parties.

MacAlister testified at his deposition that he began working for Miles as an associate on January 8, 1990. Although satisfied with MacAlister's performance as a trial lawyer, both Miles and Goldstein were deeply concerned about his "organizational skills." Those concerns were apparently justified, as MacAlister admitted that his disorganized working habits were his "Achilles' heel."

In 1996, MacAlister accepted an offer of employment with the Baltimore firm of "Gordon, Feinblatt." [5] When MacAlister told Miles about the offer, Miles purportedly became upset, insisting that MacAlister meet him at his house to talk, while purportedly exclaiming: "I can't believe you're leaving me. . . .

---

5. We assume that MacAlister's testimonial references to "Gordon, Feinblatt," were shorthand for the firm known as "Gordon, Feinblatt, Rothman, Hoffberger & Hollander, LLC."

[W]e can't operate without you or, ... this is horrible or this is really bad news for us. I know I can talk you into staying."

MacAlister met with Miles at his home, but upon arriving he cautioned: "I just want to emphasize to you I'm here out of respect for you. I never tell anybody I won't listen to you, but I am committed to leaving. I'm leaving. I've given my word, and that's the end of the story." Describing the conversation that ensued, MacAlister stated:

I said okay. I'm not happy with the way you treat me and I'm not happy with the way you treat the staff.

And he said what have I ever done to upset you. And then he said I know, it's because I yell at you all the time. I said, Steve, you don't just yell at me all the time. It's abusive yelling. You threaten to fire me all the time.

I now own two houses. I have a lot of mortgage payments, and I can't afford an income interruption.

Miles promised not to threaten to fire or yell at MacAlister in the future and to meet the financial terms of the Gordon, Feinblatt offer. When MacAlister told Miles that those promises were not enough to induce him to stay, Miles offered to sell his firm, upon his retirement, to MacAlister, if he purchased it with Goldstein and Tom Bernier, another firm associate. That prompted the following exchange:

[Miles said] what if I offer the business to you. I said what does that mean. And he said when I turn 60, you, Scott and Tom [Bernier] will buy me out. . . .

[T]his would have to be subject to [Goldstein's] approval, and you guys wouldn't have to put up any money. We would have the business appraised when I turn 60 or about that time.

You guys would have to guarantee me an income of like [$]175 to 200,000 a year until you paid it off out of firm proceeds. And that way you don't have to come up with any money. You guys pay me off, I continue to make ads for you the whole time while you guys are running the firm, and, of course, I'd keep some voice on how things were

going so you guys wouldn't drive it into the ground, make sure my investment is safe.

Miles told MacAlister that the purchase price of the firm would be based on an appraisal but that it was "all subject to [Goldstein's] approval." MacAlister replied that he would think about it overnight, but that Gordon, Feinblatt would have to let him "off the hook" before he could accept Miles's proposal.

When MacAlister informed Goldstein of Miles's proposal, Goldstein responded that he already "had a 50/50 deal with Tom Bernier," [6] to purchase the firm. But, he added: "I really want you to stay." Goldstein and MacAlister then agreed that MacAlister would have a greater role in the management of the firm. And Miles increased MacAlister's salary while allegedly assuring him: "[W]e'll put everything in writing. Don't worry. You know, I'm totally committed. And, you know, I'll never yell at you again."

When MacAlister told Tom Glancy, a partner at Gordon, Feinblatt, about Miles's offer, Glancy purportedly advised him that, if he accepted Gordon, Feinblatt's offer, after two or three years he would be "eligible for partnership." MacAlister claims he replied: "I have an opportunity to own this business. I don't come from money. I don't come from a family that has the resources to buy into a partnership. I've got a chance in owning half an operation that makes quite a bit a money," to which Glancy responded that the decision was MacAlister's. Deciding to stay with Miles, MacAlister told Goldstein that "the deal was on." That deal, according to MacAlister, was that he, Goldstein, and Bernier, would purchase Miles's firm, and each would own a one-third interest in that firm. But, before that arrangement could materialize, Bernier left the firm.

---

**6.** Bernier was employed by Miles at the time MacAlister, Goldstein, and Miles had these discussions. He subsequently left the firm in 1997 or 1998.

In oral and written communications, Miles frequently expressed his expectation that Goldstein and MacAlister would eventually purchase his firm. Summarizing the contents of emails sent by Miles, MacAlister stated: "They would say things, for example, 'when you and Scott buy me out' or 'when you and Scott take over the practice' or 'when you and Scott some day, you know, when I turn 60, you and Scott come in here and take this place over.' " But, as Goldstein himself testified, it was understood by the parties that Miles would not sell his firm to them unless MacAlister made substantial progress in becoming "more organized in his day to day activities as an attorney in the practice" and more "accessible during normal work hours."

MacAlister claims, however, that in 1997 Miles told him: "I want you to know whatever deal we have is on. You really turned yourself around. I'm very impressed with you. You're trying a lot of cases. You're getting great results." In the summer of 1998, Miles, according to MacAlister, said that the "deal [was] a hundred percent on."

In September 1998, Miles attended the bat mitzvah of one of Goldstein's daughters. At that event, he had a conversation with Bruce D. Block, an attorney, in which he raised the subject of Block and Goldstein purchasing his firm. The colloquy lasted "a couple minutes," but never amounted to more than, in Block's words: "[M]aybe he was interested in selling and maybe I was interested in buying." It was, at that time, that Miles told Block that "he would not sell his law firm to Scott Goldstein, alone, due to the fact that [he] did not perceive that Mr. Goldstein had the financial backing or wherewithall [sic] to permit him to purchase the law firm." Goldstein and Block later discussed with one another, and then with Miles, the possibility of purchasing Miles's firm. Describing the conversations that he and Block had with Miles, Goldstein stated:

> We tried to reach various different agreements. And as a result of various different things that transpired during the course of those negotiations, things changed. At times, the purchase price was discussed at one level. At times, it was

discussed in another fashion.... There were different prices depending upon what Mr. Miles was willing to do and how it was going to work.

Two months after Miles first spoke with Block, Miles sent Goldstein an e-mail stating: "I want you and [Block] and me to know by no later than February 1st what we are doing because if you decide to leave, I want to start running an ad as soon as possible." Goldstein replied by e-mail: "I will inform [Block] of your deadline of February 1st and he will try to put an offer together. If we don't succeed, in light of your email, I imagine that I will not otherwise have an opportunity to buy you out." Despite the February 1, 1999, deadline, Goldstein and Block did not submit an offer by that date.

In April 1999, Miles stated that he would accept a purchase price of $1.75 million to be paid over time at a five percent interest rate. He proposed that the entire purchase price would be paid to him as salary, making it tax deductible to what would be a new firm consisting of Goldstein and Block. That proposal was not accepted, and negotiations continued.

In May 1999, Goldstein and Block first mentioned a possible purchase price of $1.3 million and a downpayment of $100,000. Although Miles eventually said "okay" to both, he did not believe that Goldstein and Block had made "a firm offer," because "they kept changing" the terms of their offer and never committed it to writing.

According to Goldstein, they "had been inching closer and closer to the deal," but he acknowledged that, as of May 1999, no "agreement had been reached." Miles characterized the discussions with regard to a purchase price, down payment, and interest rate, as "an ongoing thing."

In the meantime, Goldstein had apparently left MacAlister in the dark as to his plans to buy the firm with Block. Sensing that something was amiss, MacAlister asked Goldstein what was going on. Goldstein declined to discuss the matter with him and suggested he speak with Miles. When he did, Miles told him:

I'm not going to lie to you. I'm looking to sell the firm. And I said we have a deal. And he said the deal was contingent on you being able to buy me out. You and [Goldstein] can't buy me out. The business isn't doing well. So, I'm looking to sell it to somebody else.

At some point, during the 1999 negotiations with Goldstein and Block, Miles disclosed that he was also negotiating with someone else. That disclosure prompted Goldstein and Block to present Miles with a written proposal to purchase his firm for $1.3 million. MacAlister testified that he "wasn't involved" in the Goldstein and Block offer and that he "only found out afterwards once their offer had been rejected."

In a handwritten note attached to that proposal, Goldstein wrote: "[P]lease give this proposal genuine consideration. I want this opportunity. I hope that in weighing it against the other alternative, you always consider my loyalty...." In response, Miles told Goldstein that he would consider the offer over the weekend. According to Goldstein, Miles said "he wouldn't reach a decision before Monday and that he would let me know."

The other party, with whom Miles was negotiating, was the law firm of Saiontz & Kirk. At a meeting on May 15, 1999,[7] Miles agreed to accept Saiontz and Kirk's offer of $1.75 million for his firm. Although Miles informed Goldstein and Block that he was negotiating with someone else, he did not advise them that he had accepted an offer from Saiontz & Kirk. In fact, Goldstein only learned of that deal the weekend that Miles was supposed to be considering his and Block's offer. Goldstein stated:

[O]n that Friday, he left the office and told me he wouldn't reach a decision before Monday and that he would let me know. I would be the first person to know ultimately what his decision was. And Saturday morning, I picked up the

---

7. Miles could not recall the precise date of this meeting, but he testified at his deposition that it occurred in May, and he used May 15th as an estimate as to when the meeting occurred.

newspaper and found that he had consummated a deal with [the law firm of] Saiontz & Kirk prior to that time.

Goldstein and MacAlister produced expert testimony that they could have earned $9,510,068 from the firm had Miles sold it to them. They also claimed they were entitled to the difference between the value of the firm, which they allege was $2 million,[8] and the $1.3 million that Miles allegedly agreed to accept from them as the purchase price.

## MOTION TO DISMISS

■ Miles filed a motion to dismiss with this Court, which was denied without prejudice. Miles then renewed the motion in his brief to this Court, arguing that Goldstein and MacAlister's appeal should be dismissed because they

(a) failed to order necessary transcripts timely, (b) failed to have the transcripts included in the Record transmitted to this Court, (c) misled the Court by claiming—contrary to the transcript—that they were unaware that a private court stenographer was used for the February 10 hearing, (d) never consulted [him] concerning the preparation of the Record Extract, and (e) unilaterally filed a 1200–page Record Extract that does not comply with the Rules and that contains obviously extraneous material.

In sum, Miles requests that this Court dismiss Goldstein and MacAlister's appeal because the record extract did not comply with Maryland Rule 8–501, the rule governing the filing of record extracts. But Rule 8–501 states that, "[o]rdinarily, an appeal will not be dismissed for failure to file a record extract in compliance with this Rule." Md. Rule 8–501(m).

The February 10, 2003 transcript, which Miles alleges was omitted from the record extract, was in fact included in the record extract. Other possible gaps in the record extract

---

8. Miles argues that the evidence offered regarding the value of the practice was inadmissible. Given our resolution of this appeal, it is unnecessary for us to reach this issue.

were cured by Miles's appendix to his brief, which included additional documents that he believed were improperly omitted. And while we agree with Miles that the record extract was voluminous and was not presented in the format required by Rule 8–501, it does not warrant dismissal of the appeal. Miles's motion to dismiss is therefore denied.

## MOTION TO STRIKE

Goldstein and MacAlister moved to strike Miles's appendix, claiming that the documents in the appendix were not properly before the circuit court. They further claimed, in a separate motion to strike certain portions of Miles's brief, that Miles's brief addresses issues that are not before this Court, notably, whether they presented sufficient evidence of fraud or negligent misrepresentation.

The documents contained in Miles's appendix were either pleadings filed in the circuit court, this Court, or the Court of Appeals, or they were exhibits to those pleadings. Furthermore, because the circuit court ultimately granted summary judgment in favor of Miles "on all counts and all issues," the issue of whether the circuit court correctly ruled that Goldstein's and MacAlister's claims for fraud and negligent misrepresentation did not survive Miles's motion for summary judgment is before this Court. We therefore deny Goldstein and MacAlister's motion to strike Miles's appendix and their motion to strike and/or dismiss certain portions of Miles's brief.

## DISCUSSION

Goldstein and MacAlister contend that the circuit court erred in granting Miles's motion for summary judgment on the ground that no bargain ever existed between the parties and that they were therefore not entitled to lost profits or benefit of the bargain damages. But that was not the only ground relied upon by the circuit court in granting summary judgment. Ultimately, as we noted in the introduction to this opinion, the court, on appellants' motion for reconsideration, granted summary judgment in favor of Miles "on all counts

and all issues." We shall nonetheless begin our analysis by first considering the benefit-of-the-bargain issue as that was the principal issue upon which the circuit court relied in granting summary judgment in favor of Miles.

Because this issue, and ultimately the case itself, were disposed of on a motion for summary judgment, our task is to "determine if there is a genuine dispute of material fact and, if not, whether the moving party is entitled to judgment as a matter of law." *Crews v. Hollenbach,* 126 Md.App. 609, 624, 730 A.2d 742 (1999), *aff'd,* 358 Md. 627, 751 A.2d 481 (2000). We begin by resolving all inferences that may be drawn from the facts presented against the moving party. *See Gross v. Sussex Inc.,* 332 Md. 247, 256, 630 A.2d 1156 (1993). If, after doing so, there is still not enough evidence from which a jury could reasonably find for the plaintiff, we affirm the circuit court's grant of summary judgment for the defendant. *See Beatty v. Trailmaster Prods., Inc.,* 330 Md. 726, 738–39, 625 A.2d 1005 (1993). In this instance, we agree with the circuit court that appellants failed to produce evidence from which a jury could reasonably find that the parties had entered into a bargain, the *sine qua non* of a claim for benefit-of-the-bargain damages in tort or contract, and shall therefore affirm the lower court's decision.

## Benefit-of-the-bargain Damages

■ In determining "the proper measure of damages in fraud and deceit cases," Maryland applies the "flexibility theory." *Hinkle v. Rockville Motor Co.,* 262 Md. 502, 511, 278 A.2d 42 (1971). Under that theory, a victim of fraudulent or negligent misrepresentation may elect to recover either "out-of-pocket" expenses or benefit-of-the-bargain damages. The former will permit the plaintiff to recover his or her actual losses; the latter "put[s] the defrauded party in the same financial position as if the fraudulent representations had in fact been true," *Midwest Home Distrib., Inc. v. Domco Indus. Ltd.,* 585 N.W.2d 735, 739 (Iowa 1998), by awarding as damages " 'the difference between the actual value of the property at the time of making the contract and the value that it would

have possessed if the representations had been true.' " *Hall v. Lovell Regency Homes Ltd. P'ship*, 121 Md.App. 1, 12, 708 A.2d 344 (1998) (quoting *Beardmore v. T.D. Burgess Co.*, 245 Md. 387, 390, 226 A.2d 329 (1967)). But, as will become evident, the benefit-of-the-bargain rule is not so elastic that every victim of a false representation is entitled to receive the benefit of what he or she was promised.

The flexibility theory is composed of four "conclusions" reached by the Supreme Court of Oregon in *Selman v. Shirley*, 161 Or. 582, 85 P.2d 384 (1938) and later cited with approval by the Court of Appeals in *Hinkle*. They are:

"(1) If the defrauded party is content with the recovery of only the amount that he actually lost, his damages will be measured under that rule;

(2) if the fraudulent representation also amounted to a warranty,[9] recovery may be had for loss of the bargain

---

**9.** It is not altogether clear what the *Selman* court meant by "warranty." As the inestimable Karl Llewellyn observed at about the time *Selman* was decided, "To say 'warranty' is to say nothing definite as to legal effect...." K. Llewellyn, Cases and Materials on the Law of Sales 210 (1930), *quoted in* John Edward Murray, Jr., Murray on Contracts 543, n. 19 (3d ed.1990). "[T]he sane course," he advised, "is to discard the word from one's thinking." Id. He, nonetheless, "agreed to retain the term 'warranty' in the UCC," Murray, *supra*, at 543, n. 19, but we are cautioned by Professor John Edward Murray, Jr. that "its retention was simply one of innumerable compromises he [Llewellyn] made to ascertain the enactment of the new Code throughout the Country." Id. More recently, Professor Samuel Williston, expressed similar sentiments: " 'Warranty' is a word which illustrates as well as any other the fault of the common law in the ambiguous use of terms. The word naturally means promise, but in different kinds of contracts is used with varying meanings." 1 Samuel Williston, *A Treatise on the Law of Contracts* § 38.19, at 451 (Richard A. Lord ed., 4th ed.1990)(internal citation omitted).

Indeed, the *Selman* court may simply have used the word "warranty" as a synonym for "promise," as, in the same sentence, it refers to a breach of a "representation ... amount[ing] to a warranty" as a "broken promise." *Selman*, 85 P.2d at 394. In any event, that was the ambiguous state of affairs when, in 1971, the Court of Appeals adopted *Selman's* flexibility theory in *Hinkle*. Forty years after *Selman* and seven years after *Hinkle*, an Oregon court, in 1978, expressly limited Selman's holding to "warranties of value." *See Galego v. Knudsen*, 281 Or. 43, 573 P.2d 313, *modified on other grounds*, 282 Or. 155, 578 P.2d

because a fraud accompanied by a broken promise should cost the wrongdoer as much as the latter alone;

(3) where the circumstances disclosed by the proof are so vague as to cast virtually no light upon the value of the property had it conformed to the representations, the court will award damages equal only to the loss sustained; and

(4) where . . . the damages under the benefit-of-the-bargain rule are proved with sufficient certainty, that rule will be employed."

*Hinkle,* 262 Md. at 511–12, 278 A.2d 42 (quoting *Selman,* 85 P.2d at 394).

Those four "conclusions" have been described as "four alternative methods available to an injured party in ascertaining damages arising from an action for fraud and deceit." *Aeropesca Ltd. v. Butler Aviation Int'l, Inc.,* 44 Md.App. 610, 630, 411 A.2d 1055 (1980). That description is misleading. The third conclusion is not an option for the plaintiff to choose but an instruction to the trial court to " 'award damages equal only to the loss sustained' " when " 'the circumstances . . . are so vague as to cast virtually no light upon the value of the property had it conformed to the representations. . . .' " *Hinkle,* 262 Md. at 512, 278 A.2d 42 (quoting *Selman,* 85 P.2d at 394). In other words, it instructs the court to award damages in accordance with conclusion (1), when the "vague" circumstances described in conclusion (3) prevail.

Conclusion (4) performs the same role for conclusion (2) that conclusion (3) performs for conclusion (1). While conclusion (3) permits the recovery of actual losses under conclusion (1) when " 'circumstances disclosed by the proof are so vague' " that no value can be assigned to " 'the property had it conformed to the representations,' " *id.* (quoting *Selman,* 85 P.2d at 394), conclusion (4) permits the recovery of benefit-of-the-bargain damages under conclusion (2) when damages

769 (1978); *Staley v. Taylor,* 165 Or.App. 256, 994 P.2d 1220 (2000). It is thus up to the Court of Appeals as to whether to keep the flexibility theory as later construed by the Oregon courts, expand it, or discard it altogether.

" 'are proved with sufficient certainty.' " *Id.* (quoting *Selman,* 85 P.2d at 394). In short, while conclusions (1) and (2) spell out two alternative measures of damages—out-of-pocket expenses and benefit-of-the-bargain damages—conclusions (3) and (4) define the evidential circumstances under which either or both may be obtained.

That is also born out by the way in which the Oregon court framed these four conclusions. Conclusions (1) and (2), the two different measures of recovery, are cast in parallel language, indicating that they are alternative choices, but conclusions (3) and (4) are not, signaling that the latter two conclusions are not two different rules of recovery, as conclusions (1) and (2) are, but descriptions of when the two alternative measures of damages, contained in conclusions (1) and (2), are applicable.

And, finally, to treat these four conclusions as "four alternative methods" for "ascertaining damages arising from an action for fraud or deceit" would in effect create two measures for obtaining benefit-of-the-bargain damages within the four conditions, rendering the flexibility theory either repetitious or internally inconsistent.

The flexibility theory thus presents two, not four, types of damages: "actual loss" and "benefit-of-the-bargain." Its four conclusions instruct when one or both of these measures of damages are available to an injured party. And that construction is consistent with Professors Charles T. McCormick and William L. Prosser's description of that theory. In describing the flexibility doctrine, Professor McCormick divided the four conclusions into two measures of damages, stating:

> In the first place, it seems that in every case the defrauded plaintiff should be allowed to claim under the "out-of-pocket" loss theory if he prefers. In the second place, the plaintiff should be allowed to choose the other theory [benefit-of-the-bargain], and recover the value of the bargain as represented, if the trial judge, in his discretion considers that, in view of the probable moral culpability of the defendant and of the definiteness of the representations and the

ascertainability of the represented value, the case is an appropriate one for such treatment.

Charles T. McCormick, *Handbook on the Law of Damages* § 121, at 454 (1935) (footnotes omitted); *see also* William L. Prosser, *Handbook of the Law of Torts* § 105, at 752 (3rd ed.1964).

Nonetheless, the flexibility theory has caused some confusion among those state courts that have sought to adopt it. While some courts have embraced the notion that this theory creates only two measures of damages. *See, e.g., Edward J. DeBartolo Corp.v. Coopers & Lybrand*, 928 F.Supp. 557, 565 (W.D.Pa.1996) (applying Pennsylvania law); *Sorensen v. Gardner*, 215 Or. 255, 334 P.2d 471, 476 (1959); *Staley v. Taylor*, 165 Or.App. 256, 994 P.2d 1220, 1225 (2000). Others have not. *See, e.g., McConkey v. AON Corp.*, 354 N.J.Super. 25, 804 A.2d 572, 588–89 (App.Div.2002). The latter case treated conclusions (2) and (4) as if they created separate and distinct kinds of damages, ruling that to obtain benefit-of-the-bargain damages under conclusion (4) does not require proof of a warranty or a promise under conclusion (2). *See McConkey*, 804 A.2d at 588–89. And that is the position, which Goldstein and MacAlister now urge this Court to adopt.

But this difference of opinion need not divert us. The question of whether Goldstein and MacAlister were required to prove that Miles's representations constituted a "warranty" under conclusion (2) lies beyond the scope of our review, because Goldstein and MacAlister have not been able to show, as the circuit court held, that they had ever entered into a bargain with Miles to purchase his firm.

To recover benefit-of-the-bargain damages, Goldstein and MacAlister must first show that they entered into a bargain with Miles for the purchase of his firm. *See Hall*, 121 Md.App. at 12, 708 A.2d 344 (describing damages under the benefit-of-the-bargain test as " 'the difference between the actual value of the property at the time of making the contract and the value that it would have possessed if the representations had been true' " (quoting *Beardmore*, 245 Md. at 390,

226 A.2d 329)); 37 Am.Jur.2d *Fraud & Deceit* § 416, at 408 (2001) (defining benefit-of-the-bargain as "the difference between the actual value of the property at the time of making the contract and the value that it would have possessed if the representations had been true"). But what is a bargain? That transactional contrivance can be best understood if we place it in a conceptual context. When we do, we discover that it is narrower in scope than an agreement but broader in scope than a contract.

 "A contract is defined as 'a promise or set of promises for breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty.' " *Kiley v. First Nat'l Bank of Md.*, 102 Md.App. 317, 333, 649 A.2d 1145 (1994) (quoting Williston, *supra*, § 1.1, at 2–3). An "agreement," on the other hand, is "a manifestation of mutual assent on the part of two or more persons." *Rest. (Second) of Contracts* § 3 (1981). It has "a wider meaning than contract, bargain or promise;" unlike a contract, it "contains no implication that legal consequences are or are not produced." *Id.* cmt. a.

 In between those two concepts lies a "bargain." A bargain is "[a]n agreement between parties for the exchange of promises or performances." *Black's Law Dictionary* 143 (7th ed.1999) [hereinafter *Black's* ]; *see also Rest. (Second) of Contracts*, *supra*, § 3 ("A bargain is an agreement to exchange promises or to exchange a promise for a performance or to exchange performances."). "By definition, therefore, the term bargain is both narrower than the term agreement in that it is not applicable to all agreements, and yet broader than the term contract, since it includes a number of promises that in themselves are not properly definable as contracts." 1 Williston, *supra*, § 1.4, at 16–17 (footnote omitted).

 "But a bargain is always an agreement for an exchange." 1 Arthur Linton Corbin, *Corbin on Contracts* § 1.10, at 27 (Joseph M. Perillo ed., rev. ed.1993). "Since a bargain requires an agreement to exchange promises or performances, it is obvious that many agreements (that is man-

ifestations of mutual assent) which do not contemplate an exchange do not fit within the definition of bargain." 1 Williston, *supra*, § 1.4, at 17. But a "bargain is not necessarily a contract because the consideration may be insufficient or the transaction may be illegal." *Black's*, *supra*, at 143. Despite this theoretical distinction, however, the term "bargain," when employed in the phrase "benefit-of-the-bargain damages," has almost always referred to an "enforceable contract."

■ While our appellate courts have not expressly required the existence of a "bargain" to obtain benefit-of-the-bargain damages in fraud and negligent misrepresentation cases, they have done so impliedly by only recognizing the legitimacy of such damages in fraud and negligent misrepresentation cases in which there was an actual contract between the parties. *See, e.g., Downs v. Reighard*, 265 Md. 344, 345, 349, 289 A.2d 299 (1972) (contract to complete a survey of a parcel of land); *Hinkle*, 262 Md. at 503, 513, 278 A.2d 42 (contract for sale of automobile); *Hall*, 121 Md.App. at 5–7, 708 A.2d 344 (contract to purchase newly-constructed homes); *Ward Dev. Co. v. Ingrao*, 63 Md.App. 645, 650, 660, 493 A.2d 421 (1985) (contract to purchase homes). And that appears to be the position of other jurisdictions. *See, e.g., Am. Family Serv. Corp. v. Michelfelder*, 968 F.2d 667, 671–72 (8th Cir.1992) (applying Iowa law); *Edward J. DeBartolo Corp.*, 928 F.Supp. at 565 (applying Pennsylvania law); *Sorensen*, 334 P.2d at 476 (applying Oregon law).

What is more, in each of Maryland's cases—*Downs, Hinkle, Hall*, and *Ward*—the deal authorized by the contract was consummated, which at least one state court, *see Gold v. Dubish*, 193 Ill.App.3d 339, 140 Ill.Dec. 9, 549 N.E.2d 660, 667 (1989) (concluding that the benefit-of-the-bargain rule was "designed for situations where the transaction between the parties has actually been consummated based on the fraudulent representation"), as well as the official comments to section 549 of the Restatement (Second) of Torts, *see Rest. (Second) of Torts* § 549 cmts. g-l (1977), has suggested is a

prerequisite to recovering benefit-of-the-bargain damages in a contract or tort action. That, of course, did not occur here. Moreover, while all of the Maryland "benefit-of-the-bargain" tort cases involved enforceable contracts, the instant case did not.

Nonetheless, Goldstein and MacAlister seek in tort that which they would have been denied in contract: benefit-of-the-bargain damages. Goldstein and MacAlister admit that they never had a contract to purchase Miles's firm. Indeed, their counsel took it a step further by conceding, at the reconsideration hearing, that they did not even have an "agreed-to bargain." Despite that stunning, though wholly warranted admission, Goldstein and MacAlister now they claim that they did in fact have a bargain with Miles: "the sale of [Miles's] law firm to [them] at a specific price below market value." The specific price, they claim, was $1,300,000.

Yet, it was undisputed that Miles never offered to sell the firm to Goldstein and MacAlister for that amount. That figure was first mentioned, not by Goldstein and MacAlister, but by Goldstein and Block, during their negotiations with Miles to purchase his firm. When Goldstein and Block later learned that Miles was negotiating with another party, the two of them placed that amount in a written proposal and submitted it to Miles. Attached to that proposal was a note from Goldstein urging Miles to accept what was the Goldstein and Block offer. Miles responded that he would have to think about their proposal over the weekend. But, while Goldstein and Block were waiting to hear from him, they learned that Miles had accepted an offer from Saiontz & Kirk to purchase his firm under more generous terms.

■ Because MacAlister was never a party to the proposal submitted by Goldstein and Block, and, in fact, did not even know of their offer until after it was rejected by Miles, he and Goldstein cannot claim that offer as theirs. In the end, there were two different purchasing units: Goldstein and Block and Goldstein and MacAlister. That Goldstein was a member of both sets of buyers may confuse but does not blur that

important distinction. Indeed, he and Goldstein cannot now complain that Miles rejected an offer that they, as a purchasing unit, never made. The only evidence of a "bargain" between Goldstein and MacAlister and Miles were statements by Miles that he would sell his firm to them, at a "below market value" price, when he retired. Those representations hardly constituted a bargain.

 A bargain is "[a]n agreement between parties for the exchange of promises or performances." *Black's, supra,* at 143. But that definition requires further explication, as the term "promise," has two different meanings: lay and legal. While the lay meaning of "promise denotes a pledge to which the law attaches no obligation," Bryan A. Garner, *A Dictionary of Modern Legal Usage* 701 (2d ed.1995) (emphasis omitted), the legal meaning of the word "is synonymous with contract." *Id.* (emphasis omitted).

 We, of course, are only concerned here with the legal meaning of the word. A "legal" promise has been defined as "[t]he manifestation of an intention to act or refrain from acting in a specified manner, conveyed in such a way that another is justified in understanding that a commitment has been made." *Black's, supra,* at 1228. And that is the generally accepted definition. *Rest. (Second) of Contracts, supra,* § 2 ("A promise is a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made."); 1 Corbin, *supra,* § 1.13, at 35 (defining a promise as "an expression of commitment to act in a specified way ... communicated in such a way that the addressee of the expression may justly expect performance and may reasonably rely thereon"); 1 Williston, *supra,* § 1.2, at 10 (defining a promise as " 'a manifestation of intention to act or refrain from acting in a specified way,' made in such a way 'as to justify a promisee in understanding that a commitment has been made' " (quoting *Rest. (Second) of Contracts, supra,* § 2)); 17A Am.Jur.2d *Contracts* § 3, at 39 (2004) (defining a promise as a "manifestation of intention to act or refrain from acting in

a specified way, so made as to justify the promisee in understanding that a commitment has been made" (citing *Rest. (Second) of Contracts, supra*, § 2)).

 But a promise is " 'illusory when its indefinite nature defies legal enforcement.' " *Cheek v. United Healthcare of the Mid–Atlantic, Inc.*, 378 Md. 139, 150, 835 A.2d 656 (2003) (quoting *Floss v. Ryan's Family Steak Houses, Inc.*, 211 F.3d 306, 315 (6th Cir.2000)). For a promise to establish "an enforceable contract [it] must express with definiteness and certainty the nature and extent of the parties' obligations." *Kiley*, 102 Md.App. at 333, 649 A.2d 1145. " 'Vagueness of expression, indefiniteness and uncertainty as to any of the essential terms of an agreement have often been held to prevent the creation of an enforceable contract.' " *Id.* (quoting 1 Corbin, *supra*, § 4.1, at 525). " 'The parties must express themselves in such terms that it can be ascertained to a reasonable degree of certainty what they mean.' " *Id.* at 334, 649 A.2d 1145. (quoting *Robinson v. Gardiner*, 196 Md. 213, 217, 76 A.2d 354 (1950)). If the parties' agreement is " 'so vague and indefinite that it is not possible to collect from it the intention of the parties, it is void because neither the court nor jury [can] make a contract for the parties.' " *Id.* (quoting *Robinson*, 196 Md. at 217, 76 A.2d 354).

Miles's statements that he would sell Goldstein and MacAlister his firm for a price below market value, upon his retirement, were not enforceable promises. These assertions did not contain any material terms of the sale such as purchase price, date of sale, interest rate, or terms of payment. Without these terms, it is impossible to determine what "the nature and extent of the parties' obligations" were, if any. *Kiley*, 102 Md.App. at 333, 649 A.2d 1145.

Because of the vague and indefinite nature of Miles's assertions, Goldstein and MacAlister could not have reasonably relied on them. Rather, Miles's assertions amounted to no more than statements of intention because they were not "communicated in such a way that the addressee of the expression [could] justly expect performance and . . . reason-

ably rely thereon." 1 Corbin, *supra*, § 1.13, at 35. As Miles made no enforceable promise to Goldstein and MacAlister, the parties did not enter into a bargain.

Goldstein and MacAlister disagree and cite *Midwest Home Distributor, Inc. v. Domco Industries Ltd.*, 585 N.W.2d 735 (Iowa 1998) and *American Family Service Corp. v. Michelfelder*, 968 F.2d 667 (8th Cir.1992), in support of their claim that they had reached a bargain with Miles. Neither case supports that claim.

In fact, as the claim for benefit-of-the-bargain damages in both cases rested on an enforceable written agreement—a distributorship agreement in *Midwest Home Distributor, Inc.*, and a letter of intent in *American Family Service Corp.*—they highlight the evidentiary gap in Goldstein and MacAlister's claim: the absence of an enforceable agreement.

In the former case, Midwest, a floor covering distributor, entered into a distributorship agreement with Domco, a vinyl floor manufacturer. *Midwest Home Distrib., Inc.*, 585 N.W.2d at 737. Relying upon Domco's representations that Domco "was growing and increasing its market share in the United States" and Domco's promises that Midwest would be "the only stocking distributor of Domco's product in Iowa," Midwest agreed to become a Domco stocking distributor in October 1988. *Id.* Despite those assurances, Domco then entered into a written agreement with another corporation, Onthank, making Onthank a Domco stocking distributor in Iowa as well. *Id.* When Iowa's market could not support both stocking distributors, Domco terminated Midwest's distributorship. *Id.*

Midwest sued Domco, claiming, among other things, that Domco fraudulently misrepresented that it would be Iowa's only stocking distributor for Domco and that Domco's market share was growing. *Id.* at 737–38. A jury awarded Midwest $400,000 in compensatory benefit-of-the-bargain damages together with $750,000 in punitive damages. *Id.* at 738.

Affirming the decision below, the Supreme Court of Iowa held that a reasonable jury could have found that "had Dom-

co's statements been true (that is, that Domco was a growing company and Midwest would remain sole distributor), Midwest would have benefitted financially." *Id.* at 742. It consequently concluded that "[t]he jury's award of $400,000 [in benefit-of-the-bargain damages] was supported by the evidence." *Id.* It also affirmed the jury's award of punitive damages. *Id.* at 743.

In the latter case, while negotiating with Pamela and Ted Michelfelder and Michelfelder, Inc. ("the Michelfelders") to purchase their child care business, American Family Service Corporation ("AFSC") learned that the Michelfelders were negotiating with another party. *Am. Family Serv. Corp.*, 968 F.2d at 668. When AFSC demanded "a guarantee of exclusive bargaining rights," the Michelfelders sent AFSC a letter stating: "[W]e will not negotiate with any other buyer until you have the opportunity to complete your due diligence and a definitive agreement has been achieved." *Id.*

AFSC and the Michelfelders then signed a letter of intent wherein the Michelfelders agreed to sell their business to AFSC. *Id.* at 668–69. The letter included a "no-shop clause," which stated:

> [N]either the Companies nor any shareholder, officer, director, agent or representative or any of them shall, directly or indirectly, solicit any proposal to acquire any or all of the Business Assets, any or all of the stock of the Companies, or negotiate or enter into any discussions with any person concerning such matters.

*Id.* at 669.

Despite the assurances that the Michelfelders gave AFSC, they entered into a contract to sell their child care business to a third party. *Id.* at 670. When AFSC learned of this, it filed suit against the Michelfelders [10] for fraud and breach of contract. *Id.* A trial followed, and, at its conclusion, a jury awarded damages to AFSC on both counts, specifically grant-

---

10. AFSC's lawsuit also included claims against other parties, but those claims are not relevant to the issues before this Court.

ing AFSC benefit-of-the-bargain damages on its claim of fraud. *Id.*

Concluding that the damages that AFSC suffered as a result of the Michelfelders' fraud were the same as the damages they suffered as a result of the breach of contract, the trial court reduced the fraud award and limited the total damages to those that were originally awarded by the jury on the breach of contract claim. *Id.* at 671. The United States Court of Appeals for the Eighth Circuit disagreed. It found that "trial evidence demonstrated that if the Michelfelders had dealt exclusively with AFSC as they promised, AFSC would have bought the Michelfelders' child care business and benefitted financially from [that] acquisition." *Id.* at 671–72. AFSC was therefore entitled, the court concluded, to benefit-of-the-bargain damages in the amount awarded by the jury because that was the amount the jury determined AFSC would have benefitted under the bargain had "the Michelfelders [not] fail[ed] to live up to their promise of exclusivity." *Id.* at 672 & n. 6.

Thus, the two cases chiefly relied upon by Goldstein and MacAlister to bolster their claim for benefit-of-the-bargain damages actually undermine that claim by highlighting that, unlike *Midwest Home Distributor, Inc.*, and *American Family Service Corp.*, their claim did not rest on an enforceable agreement.

### Fraud and Negligent Misrepresentation Claims

 The vagueness and generality of Miles's statements to Goldstein and MacAlister, concerning the purchase of his law firm, not only undermine Goldstein's and MacAlister's demand for benefit-of-the-bargain damages but their claim they were victims of fraud and negligent misrepresentation as well. Just as a plaintiff must show that he reasonably relied upon the defendant's promises to receive benefit-of-the-bargain damages, so must he show such reliance to recover for fraud or negligent misrepresentation. The statements attributed to Miles did not provide a basis for either.

To prevail on a claim for fraud, the plaintiff must prove:

1) that the defendant made a false representation to the plaintiff;

2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth;

3) that the misrepresentation was made for the purpose of defrauding the plaintiff;

4) that the plaintiff relied on the misrepresentation and had the right to rely on it; and

5) that the plaintiff suffered compensable injury resulting from the misrepresentation.

*Sass v. Andrew,* 152 Md.App. 406, 429, 832 A.2d 247 (2003) (quoting *Nails v. S & R, Inc.,* 334 Md. 398, 415, 639 A.2d 660 (1994)).

▮▮▮ Similarly, on a claim for negligent misrepresentation, the plaintiff must prove:

(1) the defendant, owing a duty of care to the plaintiff, negligently assert[ed] a false statement;

(2) the defendant intend[ed] that his statement [would] be acted upon by the plaintiff;

(3) the defendant ha[d] knowledge that the plaintiff [would] probably rely on the statement, which, if erroneous, [would] cause loss or injury;

(4) the plaintiff, justifiably, [took] action in reliance on the statement; and

(5) the plaintiff suffer[ed] damage proximately caused by the defendant's negligence.

*Martens Chevrolet, Inc. v. Seney,* 292 Md. 328, 337, 439 A.2d 534 (1982).

In support of their contention that Miles's misrepresentations constituted fraud or, at the very least, negligent misrepresentation, Goldstein and MacAlister point to the same assertions that they did to support their claim for benefit-of-the-bargain damages, that is, statements that Miles allegedly made that he would sell Goldstein and MacAlister his law firm for less than its market value when he retired. Whether

Goldstein and MacAlister had " 'the right to rely' " on those statements, as required by their fraud claim, *Sass*, 152 Md. App. at 429, 832 A.2d 247 (quoting *Nails*, 334 Md. at 415, 639 A.2d 660), or could "justifiably take action in reliance" on those statements, as required by their negligent misrepresentation claim, *Martens Chevrolet, Inc.*, 292 Md. at 337, 439 A.2d 534, turns on whether these assertions were more than a "statement of opinion, judgment or expectation." *Buschman v. Codd*, 52 Md. 202, 207 (1879).

A statement that is "vague and indefinite in its nature and terms, or is merely a loose conjectural or exaggerated statement, is not sufficient to support" either a fraud or negligent misrepresentation action, because "such indefinite representations ought to put the person to whom they are made, upon the inquiry, and if he chooses to put faith in such statements, and abstained from inquiry, he has no reason to complain." *Id.* As the Court of Appeals more recently observed: "Ordinarily · . . . the representation must be definite, and mere vague, general, or indefinite statements are insufficient, because they should, as a general rule, put the hearer upon inquiry, and there is no right to rely upon such statements." *Fowler v. Benton*, 229 Md. 571, 579, 185 A.2d 344 (1962).

Miles's assertions that he would sell his firm to Goldstein and MacAlister for less than its market value upon his retirement, were not expressions of a firm intention to sell the firm to them; they were, rather, statements of probability or expectation. *See Buschman*, 52 Md. at 207. The expectation was that if Goldstein and MacAlister were still employed by Miles when he was ready to retire, and if the parties could agree on terms of the purchase, an agreement to sell the practice would be reached, but this expectation does not amount to an actionable misrepresentation, if in fact it was ever a misrepresentation.

Other than a vague and general statement that the firm would be sold to Goldstein and MacAlister at a price below market value and that would occur at an unspecified date in

the future, namely, Miles's retirement, the assertions did not contain any material terms of the sale. No purchase price, date of sale, interest rate, or terms of payment were discussed, much less agreed upon. Consequently, those statements were too indefinite, vague, and general to be considered as anything more than expressions of expectation or probability and therefore are not actionable as fraudulent or negligent misrepresentations.

Furthermore, in determining whether the reliance was reasonable, the background and experience of the party that relied upon the representation is relevant. *See Parker v. Columbia Bank,* 91 Md.App. 346, 362, 604 A.2d 521 (1992) (considering the relying party's experience in the area of the transaction that occurred). This situation was not one in which one party was a sophisticated business entity and the other an inexperienced consumer. All of the parties in this matter—Goldstein, MacAlister, and Miles—were lawyers with many years of practice under their respective belts. It is not just unreasonable, but inconceivable, that experienced lawyers would have relied on such nebulous representations. Surely, they would have counseled a client that such representations were too vague to be relied upon, especially in the context of a million dollar deal. We therefore conclude that appellants failed to produce sufficient evidence that they reasonably relied upon Miles's representations.

## Goldstein's Claim for Backpay

Although this issue was not presented, or even alluded to, in the "Question Presented" section of their brief, appellants, in the final paragraph of their brief, tack on the following claim: The circuit court erred because it "failed entirely to address the additional element of damages sought by Mr. Goldstein, in the amount of $33,000 for Miles' failure to fulfill his obligations to pay Mr. Goldstein concerning his additional income for calendar year 1997." The brief describes this claim as "an entirely separate claim for a fixed liquidated sum." "At a minimum" according to the brief, Miles's "motion for summary

judgment should have been denied on this aspect of the Appellants' claims." No further argument is presented.

But, at the hearing on Goldstein and MacAlister's motion for reconsideration, the circuit court did address that issue, stating:

> With respect to the $33,000 claim, of Mr. Goldstein, the evidence is that in the light most favorable to the Plaintiff that the promise was made in 1997 and it was for wages in 1997. Now, those wages became due, from the Plaintiff's evidence, at the end of 1997 for 1997 wages. It was due then. So that any action to recover on the failure to pay those wages accrued at that time within a reasonable time after the end of the year, after time enough to calculate whether Mr. Miles had earned $666,000 ... and to see how much Mr. Goldstein earned. But certainly more than three years have passed from the time that those wages, if due, were payable.... The Amended Complaint [raising this claim] was filed December 21st, 2001, but anyway, more than three years have passed. The claim is barred by the Statute of Limitations.

The record thus clearly shows that the circuit court did address Goldstein's claim for backpay at the hearing on the motion for reconsideration. Because Goldstein argued only that the circuit court erred in failing to address the issue, we need not review the propriety of the circuit court's ruling on that issue.

**APPELLEE'S MOTION TO DISMISS DENIED.**

**APPELLANTS' MOTION TO STRIKE APPELLEE'S APPENDIX AND MOTION TO STRIKE AND/OR DISMISS DENIED.**

**JUDGMENT AFFIRMED.**

**COSTS TO BE PAID BY APPELLANTS.**

Dissenting opinion by ADKINS, J.

ADKINS, J., dissenting.

Ancient Roman poet Ovid once facetiously counseled, "See that you promise: what harm is there in promise? In promises anyone can be rich."[11] This case is all about defining what harm there can be in promises, especially if they are falsely made. False promises of riches allegedly kept appellants Scott B. Goldstein, Esq. and James K. MacAlister, Esq. ("the Associates") in the long-term employ of appellee Stephen L. Miles, Esq., thereby causing them to lose other, more profitable business opportunities. The Associates allege that Miles made fraudulent representations that, upon his retirement, he would sell his lucrative personal injury law firm to them on favorable terms, enabling them to become wealthy lawyers.

I respectfully dissent from the majority decision. In my view, benefit-of-the-bargain damages are available in this case because they could be proven with reasonable certainty, and Miles' alleged fraud and negligence rendered out-of-pocket losses difficult or impossible to prove. Further, benefit-of-the-bargain damages should not be limited to cases involving a warranty.

Although the majority does not reach the question of whether there was sufficient evidence of fraud, 1 address it here because it was an alternative ground relied on by the circuit court in granting summary judgment.

## FACTS[12]

Goldstein began to work for Miles as an associate attorney in approximately 1985. Miles successfully marketed his firm

---

**11.** *See* Publius Ovidius Naso, *Ars Amatoria*, 1.443–44, *at The Columbia World of Quotations* (Columbia University Press 1996), *at* http://www.bartleby.com.

**12.** Although some of the facts set forth here overlap with the factual narration in the majority opinion, I rely on some different facts, and point out different inferences that can be drawn from those facts. For this reason, and for clarity in setting forth my views, I have included a statement of facts in this dissent. Because this is an appeal from a

by television ads in which he appeared. The firm prospered. Goldstein testified in deposition that, during an employment interview, Miles told him that, "If it worked out to be a marriage between he and I, my future would be very bright."

As the years passed, Miles began to spend less time in the practice, and Goldstein's level of responsibility and time commitment dramatically increased. Goldstein was largely responsible for managing the firm, and generally worked 60 or 70 hours per week. Miles still earned a high income from the firm, making as much as $666,000 from the practice in one year. Goldstein's highest one year earnings with Miles was approximately $198,000, which he made in 1994 or 1995. In 1997, Goldstein earned $166,000.

In 1997 or 1998, Miles told Goldstein that, because Miles was earning so much, Goldstein would earn at least $200,000 for the year 1997 or 1998. Miles failed to pay him this amount, compensating him only $166,000 for this year of employment.

On many occasions during the course of Goldstein's employment with Miles, the latter told Goldstein that the practice "would be sold to [Goldstein] as an acknowledgment of [his] longevity and [his] commitment to the practice[,] for less than what was otherwise perceived to be the market value[.]" Miles told Goldstein that he would sell the practice to him "on the terms that he knew that I could afford and make." According to Goldstein, by 1993, Miles "had essentially already guaranteed to me ... that the practice would be mine along with co-participants." As Goldstein characterized the discussions:

> Mr. Miles had regularly told me that we would hire an appraiser who would come in and would appraise the belongings of the practice ... the furniture or whatever there was, that we would agree on a payout for that, that ... we would agree on a percentage of the fees to be paid to him,

---

grant of summary judgment in favor of an appellee, I consider them in the light most favorable to the appellants. *See Crews v. Hollenbach*, 358 Md. 627, 644 n. 9, 751 A.2d 481 (2000).

that we would have to agree to affix a number for the good will, that he would take back the financing on the ... practice because he knew ... that I wouldn't be able to go out and borrow the kind of money necessary, so that we would hold the financing on it because what he was primarily interested in achieving ... was a stream of income....

One of Miles' requirements for the acquisition was that another lawyer must purchase the practice with Goldstein.

Goldstein acknowledged in his deposition that, as of 1993, the exact terms of the acquisition were not finalized:

[T]here were not a lot of stone cold specifics that had been agreed upon. It was more a format, an outline within which the acquisition of the firm was to occur. There were certain things that were hard and fast ... That he absolutely would take back the financing, that he recognized that I would have to pay him off over a period of time, that he wanted to have someone else involved in the practice in addition to myself.... It was agreed that he would make himself available to assist in the marketing of the law firm by performing on commercials.

Those are things that were clearly essential elements of the deal. It was once he started to involve others in the process, it was agreed ... more specifically down the road that I would also be in a position to be the managing or the majority owner of the practice.

Goldstein did everything Miles asked of him in connection with the practice and the intended acquisition:

I did everything that this man asked me to do and exceeded that over a period of 15 years. I couldn't have been more committed. And despite my efforts, my undying efforts, and despite the fact that I sat down and made a significant effort to negotiate with Mr. Miles in good faith, Mr. Miles refused to sell me the firm and Mr. Miles specifically misled me as far as his negotiations with other parties.

MacAlister began working for Miles as an associate attorney on January 8, 1990. The relationship between MacAlister and Miles was not smooth, however, and eventually MacAlis-

ter sought opportunities for other employment. In 1996, he told Miles that he had accepted a job with the Baltimore firm of "Gordon, Feinblatt."[13] When MacAlister told Miles that he was resigning and had accepted the Gordon, Feinblatt offer, Miles was upset, and repeatedly asked MacAlister to meet him at his house to talk. As MacAlister characterized their telephone conversation, Miles said: "I can't believe you're leaving me. I can't live with—you know, not that I can't live without you, but I—you know, we can't operate without you or, you know, this is horrible or this is really bad news for us. I know I can talk you into staying."

MacAlister testified at his deposition that he was only willing to meet with Miles to avoid burning bridges, that he had made up his mind. When MacAlister arrived at Miles' house, he told Miles: "I just want to emphasize to you I'm here out of respect for you. I never tell anybody I won't listen to you, but I am committed to leaving. I'm leaving. I've given my word, and that's the end of the story." MacAlister elaborated on the conversation between them:

> I said "okay. I'm not happy with the way you treat me and I'm not happy with the way you treat the staff." ...
>
> And he said "what have I ever done to upset you." And then he said "I know, it's because I yell at you all the time." I said, "Steve, you don't just yell at me all the time. It's abusive yelling. You threaten to fire me all the time.
>
> I now own two houses. I have a lot of mortgage payments, and I can't afford an income interruption."

Miles promised not to fire or yell at MacAlister in the future, and then offered to meet the financial terms of the offer from Gordon, Feinblatt. He also complimented MacAlister on his ability as a trial lawyer. According to MacAlister, when he told Miles these promises were not enough to induce him to stay, Miles

---

13. I, too, assume that, when referring to "Gordon, Feinblatt," MacAlister meant the firm currently known as "Gordon, Feinblatt, Rothman, Hoffberger & Hollander, LLC." I shall use "Gordon, Feinblatt" when referring to this firm.

paused, and then said to me "what if I offer the business to you." I said "what does that mean." And he said that "when I turn 60, you, Scott and Tom [Bernier] will buy me out. . . . [T]his would have to be subject to [Scott Goldstein's] approval, and you guys wouldn't have to put up any money. We would have the business appraised when I turn 60 or about that time.

You guys would have to guarantee me an income of like [$]175 to 200,000 a year until you paid it off out of firm proceeds. And that way you don't have to come up with any money. You guys pay me off, I continue to make ads for you the whole time while you guys are running the firm, and, of course, I'd keep some voice on how things were going so you guys wouldn't drive it into the ground, make sure my investment is safe[.]"

Miles told MacAlister that the deal was "subject to [Goldstein's] approval" and that the price of the firm would be based on an appraisal. At the end of the meeting, Miles said that he would talk with Goldstein. MacAlister told Miles he would think about it overnight, but that "any decision by me is contingent on Gordon[,] Feinblatt letting me off the hook[.]"

MacAlister went to discuss the offer with Goldstein, who said he "had a 50/50 deal with Tom Bernier,[14] and what Steve's asking me to do is to give up a chunk of that to give some to you, and he's asking [Bernier] to give up a chunk of that and give some to you. . . . I really want you to stay." After further conversations between Goldstein and Miles, as well as the three of them, the parties expressed that it was "a deal." They discussed that MacAlister would have a greater role in the management of the firm. Miles said: "[W]e'll put everything in writing. Don't worry. You know, I'm totally committed. And, you know, I'll never yell at you again[.]"

When MacAlister called Gordon, Feinblatt partner Tom Glancy to tell him about Miles' offer, Glancy advised MacAlister that after two or three years he would be "eligible for

---

14. Bernier left the employ of Miles in 1997 or 1998.

partner[.]" MacAlister told Glancy, "I have an opportunity to own this business. I don't come from money. I don't come from a family that has the resources to buy into a partnership. I've got a chance in owning half an operation that makes quite a bit a money." After Glancy released him from any obligation to Gordon, Feinblatt, MacAlister told Miles and Goldstein that "the deal was on."

Thereafter, Miles also made various references to the deal in conversation and e-mails that he sent to MacAlister. As MacAlister explained, "They would say things, for example, when you and Scott buy me out or when you and Scott take over the practice or when you and Scott some day, you know, when I turn 60, you and Scott come in here and take this place over." One day, after Miles asked MacAlister to meet him at a Starbucks, Miles told MacAlister: "I want you to know whatever deal we have is on. You really turned yourself around. I'm very impressed with you. You're trying a lot of cases. You're getting great results."

In September 1998, Miles had a conversation with Bruce D. Block, an attorney known to both Goldstein and Miles, about joining with Goldstein in his purchase of the practice. Thereafter, Block and Goldstein negotiated with Miles about their joint purchase of the practice.[15] When asked whether he made a definite offer to buy the practice, Goldstein said

> In conjunction with Mr. Block, Yes. I don't recall the exact, specific amount that was agreed upon. We tried to reach various different agreements.... There were different prices depending upon what Mr. Miles was willing to do and how it was going to work. At one point in time, there was an offer, I believe, of $1.3 million plus interest, and Mr.

---

**15.** Appellants do not cite us to any portion of the record explaining what role MacAlister was intended to play in this proposed acquisition. When asked this question at oral argument, counsel for appellants replied that MacAlister was intended to be part of the purchasing group. Although the absence of evidence on this point leaves an obvious evidentiary gap, I do not address its significance *vel non* because it was not the basis of the motion court's ruling on summary judgment.

Miles was provided with a series of amortization tables as to how he was to be paid out.

Goldstein acknowledged that as of May, 1999, he, Block, and Miles had not "reached a total meeting of the minds where an agreement had been reached." Some time late in the 1999 negotiations with Goldstein and Block, Miles disclosed that he was negotiating with someone else to purchase his practice. In June 1999, Block and Goldstein made a firm offer to purchase Miles' firm for $1.3 million.

Miles orally agreed to this purchase price, and the parties were close to working out the final terms of the agreement. In June 1999, according to Goldstein:

[W]e had been inching closer and closer to the deal and Mr. Miles kept leading me along, leading me to believe that we were closer and closer to consummating that deal.

And on that Friday, he left the office and told me he wouldn't reach a decision before Monday and that he would let me know. I would be the first person to know ultimately what his decision was. And Saturday morning, I picked up the newspaper and found that he had consummated a deal with [the law firm of] Saiontz & Kirk prior to that time.

Miles agreed to merge with Saiontz & Kirk at a luncheon meeting that occurred on or about May 15, 1999, under an arrangement in which he would receive $1.7 million. He never gave Goldstein or MacAlister advance notice of his intention to do so. The closing on this deal took place on June 24, 1999.

### Circuit Court's Ruling

The Associates offered two damage theories, both relying on a benefit-of-the-bargain analysis. First, they claimed that they were entitled to the difference between the $1.3 million purchase price that Miles promised and the actual fair market value of the firm, which was sold to Saiontz & Kirk for $1.7 million. Alternatively, they claimed that they were entitled to the $9,510,068 lost profits they would have earned from the Miles firm, had they been its owners.

The trial court ruled that the Associates were not entitled to benefit-of-the-bargain damages, however, because they had not produced any evidence of a bargain. It reasoned that they could have proven damages by proving what they would have earned had they left the firm, but that they did not do so, and failed to produce other evidence of out-of-pocket damages resulting from Miles' alleged misrepresentations.

At a later hearing, the trial court ruled, in the alternative, that the Associates had not produced any evidence that Miles harbored any fraudulent intent.

## DISCUSSION

### I.

### There Was Sufficient Evidence To Create Material Dispute Of Fact As To Whether Miles Had Fraudulent Intent Not To Perform

The elements for a cause of action for fraud in Maryland were set forth in the leading fraud case, *Martens Chevrolet, Inc. v. Seney,* 292 Md. 328, 439 A.2d 534 (1982):

> To entitle the plaintiff to recover it must be shown: (1) that the representation made is false; (2) that its falsity was either known to the speaker, or the misrepresentation was made with such a reckless indifference to truth as to be equivalent to actual knowledge; (3) that it was made for the purpose of defrauding the person claiming to be injured thereby; (4) that such person not only relied upon the misrepresentation, but had a right to rely upon it in the full belief of its truth, and that he would not have done the thing from which the injury resulted had not such misrepresentation been made; and (5) that he actually suffered damage directly resulting from such fraudulent misrepresentation.

*Id.* at 333, 439 A.2d 534 (citation omitted).

Miles argued before the circuit court that his motion for summary judgment should be granted because the Associates had failed to produce any evidence of fraudulent intent on the

part of Miles. The circuit court accepted this argument as an alternate grounds for its decision to grant summary judgment.

Ordinarily, matters of intent are not decided on summary judgment. Questions involving determinations of good faith which involve intent and motive "ordinarily" are not resolvable on a motion for summary judgment. *See Rite Aid Corp. v. Hagley*, 374 Md. 665, 684, 824 A.2d 107 (2003). To be sure, summary judgment may be granted even if issues of intent and motive are involved, provided there is no material dispute of fact. *See id.* "[I]f the underlying facts are susceptible of more than one permissible inference, [however,] the choice between those inferences should not be made as a matter of law but should be submitted to the trier of fact." *Berkey v. Delia*, 287 Md. 302, 326–27, 413 A.2d 170 (1980).

In considering the motion for summary judgment, the court must draw all reasonable inferences in favor of the non-moving party. *See Nationwide Mut. Fire Ins. Co. v. Tufts*, 118 Md.App. 180, 190, 702 A.2d 422 (1997). Thus, we must decide whether the facts presented by the Associates permit a reasonable person to infer that Miles did not intend to live up to his promise to sell them the practice on favorable terms.

The Court of Appeals has instructed us that intent not to perform a contract when made may be proven by a refusal to perform shortly after the contract was made, combined with subsequent conduct and circumstances surrounding the transaction:

A fraudulent, pre-existing intent not to perform a promise made cannot be inferred from the failure to perform the promise alone. But, it may be considered with the subsequent conduct of the promisor and the other circumstances surrounding the transaction in sustaining such an inference. And it has been stated that under certain conditions, a failure or refusal to perform is strong evidence of an intent not to perform the promise at the time it was made, as where only a short period of time elapses between the making of the promise and the failure or refusal to perform it, and there is no change in the circumstances.

**448**

*Tufts v. Poore,* 219 Md. 1, 10, 147 A.2d 717 (1959) (citations omitted).

In my view, this case falls within the *Tufts* criteria, allowing an inference that Miles fraudulently represented his intent to perform under the Deal. The following circumstances, taken together, are sufficient to support an inference of Miles' fraudulent intent:

- Miles did not make the 1996 offer to MacAlister until he was faced with losing an associate he "couldn't live without" and only as an inducement for MacAlister to stay with the firm instead of proceeding with an offer from a different firm.

- In reliance on the Deal, MacAlister jettisoned his opportunity at Gordon, Feinblatt. Three or four months later, in October or November of 1996, MacAlister approached Miles and asked him if it wasn't about time to put the Deal in writing.[16] Miles refused to do so, claiming that MacAlister's work had been "bad." This about-face, so soon after Miles, with six years upon which to evaluate MacAlister, complimented him on his skills as a trial lawyer and told MacAlister that the firm could not "operate without [him]," allows the inference that Miles only promised MacAlister the Deal because he needed his services, without an intent to perform. This criticism of MacAlister, whom Miles considered indispensable three months earlier, could be viewed as simply an excuse not to put the Deal in writing. As indicated below, in Miles' view, if a promise is not in writing, it is not a promise.

---

**16.** I use the term "Deal" to refer to the promises that Miles made to Goldstein and MacAlister to sell them the business at or below fair market value, on terms favorable to them, allowing them to pay for the practice out of the firm's earning, and to continue to do marketing commercials on behalf of the firm. Although I use the term "sell" because the parties do so, the actual transaction contemplated may have been a merger of firms, with an employment contract for Miles requiring his advertising activities, etc., much like the transaction entered into by Miles with Saiontz & Kirk.

- In the winter of 1997, Miles asked MacAlister to meet him at a Starbucks restaurant in Mount Washington, and said "I just want you to know whatever deal we have is on. You really turned yourself around. I'm very impressed with you. You're trying a lot of cases. You're getting great results."

- In the summer of 1997 or 1998, after MacAlister interviewed for a job opportunity with a lawyer named Piven, he inquired of Miles whether the Deal was on, Miles said, "Jim, your deal is a hundred percent on. You're doing a phenomenal job. Everyone is happy with you. I don't want you to leave."

- In September 1998, Miles approached Block, and suggested that he join with Goldstein in the purchase of the practice. When Miles soon thereafter negotiated with Goldstein and Block about purchasing the practice, he required that Goldstein keep those negotiations secret from MacAlister, and threatened Goldstein that he would cut off negotiations if they didn't. While business negotiations are often secret, in this instance, when Miles had promised to sell to Goldstein and MacAlister as a team, the secretiveness suggests an intent to deceive MacAlister.

- In March or April of 1999, MacAlister approached Miles and again suggested that they reduce the Deal to writing. Miles said, "that's a great idea. We'll talk about it when I get back from California at the end of the summer." Miles said nothing about his ongoing negotiations with Goldstein and Block, or with Saiontz & Kirk. This is evidence that he lied to MacAlister again, in an effort to keep him on the payroll until the merger occurred.

- In 1999, after agreeing to merge with Saiontz & Kirk, Miles told MacAlister that "Donald [Saiontz] and I have been talking for years." Although Miles characterized these discussions as "done in a joking way," a jury could interpret them otherwise, as indicating that Miles never

intended to live up to his promise to Goldstein and MacAlister.[17]

- During the same post-sale discussion with MacAlister, Miles also told MacAlister that "since Harvey Kirk had no children in the practice, I could probably make arrangements to take over his practice some day . . ." According to MacAlister, "[this was] false, because Harvey Kirk has a son who recently passed the Bar, and who is now employed at Saiontz, Kirk & Miles."

- During the same post-sale discussion, when MacAlister confronted Miles, saying "we have a deal," Miles said: "the deal was contingent on you being able to buy me out. You and Scott can't buy me out. The business isn't doing well. So, I'm looking to sell it to somebody else. I have a family to think about."

- During a discussion with Miles, Goldstein confronted Miles about $33,000 unpaid compensation that Miles had promised but not paid. Miles' "exact words were, well, it's not like you have that in writing. You only have my word for that." Block, who was present, was "stunned . . . [and] left . . . with the impression that yes, Mr. Miles agreed with Mr. Goldstein I owe you the money but hey, I'm not paying you, do you have it in writing?" This evidence permits the inference that in Miles' dealings with Goldstein and MacAlister, he had no intention to live up to his promises about compensation unless they were in writing.

- Although there was evidence that Miles had discussions with Saiontz & Kirk for several years before 1999, Miles never disclosed these discussions to Goldstein or MacAlister until he told Goldstein in June 1999 or later. Because these discussions took place over a period of years, they may have occurred during the period while he was reassuring Goldstein and MacAlister of his intent to sell to

---

17. They could also be viewed as simply back-up plans, in case Goldstein and MacAlister did not perform. On a summary judgment motion, however, we must view all inferences in favor of the non-moving party.

them. Further, Miles' disclosure to Goldstein occurred after May 15, 1999, the date he verbally agreed to sell to Saiontz & Kirk. (He continued to negotiate with Goldstein and Block after this date.)

Under Md. Rule 5–404(a)(1), "evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion ..." Miles' willingness to lie to Goldstein or MacAlister about employment and compensation, however, is admissible "to show other purposes, such as proof of ... intent, ... common scheme or plan, knowledge, identity or absence of mistake or accident." *Id. See also Bagel Enterprises, Inc. v. Baskin & Sears,* 56 Md.App. 184, 203, 467 A.2d 533 (1983)(while evidence of another transaction is irrelevant to a transaction at issue, when fraud is alleged the fraudulent conduct of a defendant in a similar transaction is admissible").[18]

In my view, the facts outlined above would allow the jury to infer that Miles knew that he needed to retain his long-term employees to keep the firm operating profitably, and to enable him to have a "going business" asset to sell at his retirement. The jury could also infer that Miles engaged in a pattern of lying to the Associates when it suited him to do so, in matters pertaining to their employment and acquisition of an equity interest in the firm. This pattern of lying to them, although occurring after the Deal, could support the inference that he never intended to perform as he represented.

The circumstances outlined above may not support an inference that Miles **knew** he would not sell to Goldstein and MacAlister when he made the Deal. Rather, they may only support an inference that he thought he **might** sell to them if he did not get a better offer, and he wanted to keep his options open. In my view, however, this lesser intent also

---

18. The Associates also proffer, as evidence of Miles' habitual lying, numerous instances when Miles lied to clients, and others, over the years. This evidence is probably inadmissible under the dictates of Rule 5–404(a)(1) because it does not involve a transaction similar to the one at issue.

rises to the level of fraud because he misrepresented his **level of commitment** to the Deal.[19] The jury could infer that Miles allowed Goldstein and MacAlister to make career decisions in reliance on the Deal, knowing they would **not** do so if they knew his intent to sell to the highest bidder. He may have perpetuated that fraud when he repeatedly assured them over the years that the Deal was "on."

I distinguish this case from our decision in *First Union v. Steele Software Systems Corp.*, 154 Md.App. 97, 838 A.2d 404 (2003), *cert. denied*, 380 Md. 619, 846 A.2d 402 (2004), which involved a claim by a computerized appraisal services vendor ("Steele") that the bank never intended to live up to its obligation to make its "best efforts" to refer business to Steele. There we recognized:

> Maryland differentiates between intentional breach and fraud with good reason. Contracts are often breached when companies change their business direction because of competitive market force. Business persons entering contracts know and expect this.

*Id.* at 160, 838 A.2d 404. The distinctions are several. First, in *First Union*, the bank reduced its promises to a negotiated and signed written document defining each parties' obligations and expectations. A party's execution of a written agreement setting forth its obligations facilitates enforcement by the

---

**19.** The cause of action alleged here is unlike the claim in *Miller v. Fairchild Industries*, 97 Md.App. 324, 340–45, 629 A.2d 1293 (1993), predicated on statements made by the local CEO and management of an airplane manufacturer to employees. In that case, despite rumors that local plant was about to lose its major contract to build Boeing 757's, the CEO and management assured them that the plant would not be closing, its future was "rosy" and they could make major purchases without fear of losing jobs. In *Miller*, we indicated that the statements would be "actionable only if, at the time they were made, the speakers knew that the plant would be closed or that there would not be enough work to keep it afloat." *Id.* at 343, 629 A.2d 1293. But there, the executives had no control over the loss of the Boeing contract. In contrast, here the sale of his practice to the Associates was completely within Miles' control.

other side, and therefore is at odds with an intent to avoid performance.[20]

In contrast, here Miles promised a written agreement when the parties made the Deal, but within 3 months, refused MacAlister's request to execute one. Notwithstanding that refusal, he thereafter assured the Associates repeatedly that the Deal "was on," and that when he reached age sixty, they would own the firm.[21] Thus, the circumstances suggest that Miles sought to retain the benefits of loyalty and longevity from the Associates, but never intended to place himself in the position where he had to live up to, or pay damages for a failure to live up to, the promises that inspired that loyalty. Miles' implied statement to Goldstein, that because his promise of a guaranteed $200,000 salary was only verbal he would not even discuss it, supports this inference.

Second, the written contract in *First Union* explicitly specified that the deal between the parties was **not an exclusive** one, so that the parties necessarily contemplated that the bank would be referring business to other vendors. To the contrary, Miles promised that he would sell to the Associates (so long as a third lawyer participated with them in the purchase), and this promise **excluded** the possibility that he would sell to another party without including them.

Finally, in *First Union*, there was no early repudiation by the bank. Indeed, the bank performed to the apparent satisfaction of both parties for at least 18 months of the three year contract, referring 55,785 transactions to Steele, approximately three times the minimum business guaranteed under the contract. *See id.* at 150, 838 A.2d 404. The jury later found that the bank breached the contract during that 18 month period only in the sense that its level of referrals did not meet

---

**20.** The party to a written contract may breach, but is more likely to pay damages for failure to perform.

**21.** The question of whether the Associates could reasonably rely on his verbal commitment when he refused documentation was not the basis of the trial court's decision, and therefore should not be addressed by us.

what the jury determined to be its "best efforts," a term we held to be ambiguous. The alleged fraud was predicated, in large part, on the bank's failure to give the plaintiff more than fifty percent of its business, and the statement by a bank official that it never intended to do so.[22] But there, the "best efforts" clause could reasonably be interpreted to require less than fifty percent of the bank's business, the parties had never discussed otherwise, and Steele had never asserted that "best efforts" required greater than fifty percent until the filing of suit. Our decision in *Sass v. Andrew*, 152 Md.App. 406, 832 A.2d 247 (2003), also rested on the defendant's partial performance under the construction contract.

In contrast, the parties explicitly discussed Miles' sale to the Associates, and MacAlister promptly asked for written reassurances of that performance. But Miles **took no steps** to perform as to MacAlister. He never even negotiated with MacAlister about purchase terms, or offered him any terms at all. Further, the evidence that Miles had been talking to Saiontz & Kirk about a merger for years, could be interpreted to belie an intent to sell to the Associates when he made the Deal.[23]

Miles asserts, in support of his motion for summary judgment, that "[t]here is no genuine dispute that by April 1999 Miles had made a detailed offer to sell the firm to Goldstein and [Block] for $1.75 million." Although Miles supplies no

___

**22.** The other types of fraud alleged were verbal representations that were expressly contradicted by the parties written contract, and representations that were "so broad and vague that they are not actionable misrepresentations, and fall within the category of puffing." *Id.* at 136, 838 A.2d 404. Here, because the circuit court did not grant the summary judgment on the theory that the misrepresentations were "puffing," I do not address this portion of *First Union*.

**23.** Nor does evidence of First Union's tracking regulatory developments governing the legality of its forming its own settlement services company, which we found insufficient to support fraud in *First Union*, compare to Miles' discussions with Saiontz & Kirk. A sale to Saiontz & Kirk would preclude a sale to the Associates. First Union, on the other hand, could easily form its own company after the expiration of the three-year contract with Steele.

record cite for this assertion, he may be referring to Goldstein's admission that on April 17, 1999, Miles told Goldstein that if he and Block agreed to pay 1.75 million, plus 5% interest, he "will agree to accept a hundred percent of payment as salary, thus making the entire [purchase price] deductible to us." Goldstein characterized this as "one of [Miles'] negotiation phases," but said that they could not consummate a deal because Miles kept revising vital information about the profitability of the firm, which would necessitate further negotiations. He also generally denied that Miles was willing to consummate a deal. Goldstein testified in deposition that, "despite the fact that I sat down and made a significant effort to negotiate with Mr. Miles in good faith, Mr. Miles refused to sell me the firm and Mr. Miles specifically misled me as far as his negotiations with other parties."

It is not clear from the record what happened to the negotiations after April 17, 1999, except that Goldstein said that he and Block made a firm offer in May 1999. Miles also admitted that at one point he verbally agreed to accept $1.3 million dollars, but it is not clear when this occurred, further muddying the record.

Goldstein admitted that Miles also sent Goldstein an email on December 1998, castigating him for certain things, and demanding that they "Let me know what you decide. [Also] I want you and Bruce and me to know by, no later than Feb[.] 1 what we are doing ..." It is unclear what happened with respect to the February 1 deadline, although the parties clearly continued to negotiate after that date.

The evidence described in the preceding three paragraphs would allow a jury to infer that Miles made a good faith effort to satisfy his obligation to Goldstein. But the jury could equally well infer that, while seeking a binding offer from Goldstein and Block, without binding himself, Miles was simply using Goldstein and Block as a negotiating tool to obtain a higher price from Saiontz & Kirk.[24]

---

24. Moreover, the jury could not infer that Miles made a good faith effort to satisfy his obligation to MacAlister if it found that Miles intended to keep the negotiations secret from MacAlister.

Even if the facts about the 1999 negotiations undisputedly reflected that Miles offered the same deal to Goldstein and Block that he eventually entered with Saiontz & Kirk, which in my view, they do not,[25] we should not affirm the summary judgment on this basis. The circuit court did not rest its decision on the ground that Miles had performed his obligation by offering to sell to Goldstein and MacAlister for $1.7, but rather because: 1) there were no damages shown; and 2) there was no evidence of fraudulent intent. "We do not ordinarily undertake to sustain [a summary judgment] by ruling on another ground, not ruled on by the trial court, if the alternative ground is one as to which the trial court had a discretion to deny summary judgment." *Geisz v. Greater Baltimore Med. Ctr.*, 313 Md. 301, 314 n. 5, 545 A.2d 658 (1988). This is not a case in which we should do so.

## II.

### Background: Proof Of Damages From Fraud

In 1971, the Court of Appeals reviewed Maryland appellate history regarding treatment of damages awards in fraud actions, concluding that Maryland follows the "flexibility theory" of damages. *See Hinkle v. Rockville Motor Co.*, 262 Md. 502, 511, 278 A.2d 42 (1971)("this court has never taken a rigid stand in adopting one theory of damages to the exclusion of all others but has rather employed a flexible approach"). The flexibility theory spurns the view that fraud damages must be limited to out-of-pocket losses "in order to preserve a conceptual gulf between tort and contract actions." *Id.* at 510, 278 A.2d 42. Rather, under the flexibility theory, a plaintiff has options:

> "In the first place, it seems that in every case the defrauded plaintiff should be allowed to claim under the 'out-of-pocket' loss theory if he prefers. In the second place, the plaintiff should be allowed to choose the other theory, and recover

---

**25.** As far as I can tell from the record, the actual contract between Miles and Saiontz & Kirk was not disclosed.

the value of the bargain as represented, if the trial judge in his discretion considers that, in view of the probable moral culpability of the defendant and of the definiteness of the representations and the ascertainability of the represented value, the case is an appropriate one for such treatment." *Id.* at 512, 278 A.2d 42 (quoting Charles T. McCormick, *Damages,* § 122, at 454 (1935)).

The Court of Appeals adopted four rules that had been set forth in the seminal case of *Selman v. Shirley,* 161 Or. 582, 85 P.2d 384, 394 (1938), "as a guide for the proper measure of damages in these cases."

"(1) If the defrauded party is content with the recovery of only the amount that he actually lost, his damages will be measured under that rule;

(2) If the fraudulent representation also amounted to a warranty, recovery may be had for loss of the bargain because a fraud accompanied by a broken promise should cost the wrongdoer as much as the latter alone;

(3) where the circumstances disclosed by the proof are so vague as to cast virtually no light upon the value of the property had it conformed to the representations, the court will award damages equal only to the loss sustained; and

(4) where ... the damages under the benefit-of-the-bargain rule are proved with sufficient certainty, that rule will be employed."

*Hinkle,* 262 Md. at 512, 278 A.2d 42. Although more recent decisions of this Court have followed the Court of Appeals' decision in *Hinkle, see, e.g., Hall v. Lovell Regency Homes Ltd. P'ship,* 121 Md.App. 1, 12, 708 A.2d 344, *cert. denied,* 350 Md. 487, 713 A.2d 980 (1998); *Aeropesca Ltd. v. Butler Aviation Int'l, Inc.* 44 Md.App. 610, 630–31, 411 A.2d 1055, *cert. denied,* 287 Md. 749 (1980), the Court of Appeals has not addressed the topic since 1971.

The Associates contend that Maryland's "flexible damages" rule allows proof of their benefit-of-the-bargain damages by showing (1) the difference between the price Miles promised to sell to them and the firm's fair market value, and (2) the

profits the Associates lost by not being owners of the Miles firm in 1999 and thereafter. Miles contends, and the majority holds, that they were not entitled to any benefit-of-the-bargain damages. Miles asserts two reasons, the first of which the majority adopts. First, as the trial court and the majority concluded, they proved no "bargain." Second, Miles claims the benefit-of-the-bargain rule is only applicable when the defendant has given the plaintiff a warranty or its equivalent. I address each of these issues in turn.

## III.

### Miles' Alleged Promise To The Associates Was Sufficiently Definite To Qualify As A Bargain And Support Benefit–Of–The–Bargain Damages

Miles contends, and the majority holds, that the Associates are not entitled to benefit-of-the-bargain damages because the parties never made a final agreement. The majority points to the absence of agreement on many terms, including price, date of sale, and the terms of Miles' financing of the purchase price, such as interest rate.

The Associates most clearly answered this contention at a hearing before the circuit court:

This isn't a contract case. They want it to be.... [O]ur case is not about the negotiations between Bruce Block, Scott Goldstein and Steve Miles.... Our case is about the repeated promise ... that Mr. Miles made to Jim MacAlister and Scott Goldstein, you shall own this firm for a price below the market value when I retire. That's it.

It's not about, does your wife have to sign. It's not about, what are the number of years for the payback, what's the interest that's going to be accumulating on the indebtedness.... Our case is about that simple promise.... They want it to be based on what Mr. Miles, Mr. Block, and Mr. Goldstein negotiated years later. That's not what we've alleged.... The lawsuit is about that promise which was made over and over again....

[T]he Benefit of the Bargain Rule affords the defrauded party the right to recoup when they're not out-of-pocket anything, the difference in the value of what they would have gotten and what they would have paid for. In this instance, that is lost profits.

I agree with Miles and the majority that the parties did not reach final agreement in 1999 on the exact financial terms on which the Associates would buy the Miles firm.[26] Goldstein, who was apparently negotiating on behalf of MacAlister and Block, explicitly acknowledged that no final terms were agreed, that they were only "inching closer and closer to the deal[.]"[27] Resolution of this issue against the Associates, however, does not vitiate their claim.

The negotiations that occurred in 1999, and the parties' tentative agreement that $1.3 million was the purchase price, were **not** the facts that made the Associates' claim viable in the face of a summary judgment motion. Rather, the Associates' claim survives summary judgment because of their evidence that, years earlier, Miles promised to sell them the practice at or below fair market value, on specified terms.

This alleged promise was not, as the majority holds, too indefinite to be the basis for a bargain, even though the exact purchase price was not set. Nor was it fatal that no interest rate was set for Miles' take-back financing. The heart of this bargain was that Miles would sell his firm to Goldstein and MacAlister for no greater than fair market value, that Miles would provide them financing on terms that would allow payments to be made from firm revenues, that the Associates would not have to supply a down payment, and that Miles

---

26. I use the phrase "buy the firm" loosely, as this is the term used by the parties. The actual transaction contemplated may have been a purchase of the stock or a merger of firms, with an employment contract for Miles requiring his advertising activities, etc., much like the transaction entered into by Miles with Saiontz & Kirk.

27. Because Miles' agreement to the $1.3 million purchase offer was made only in June 1999, a few days or weeks before the sale to Saiontz & Kirk, that agreement was not what the Associates relied on in deciding to remain with the Miles firm.

would continue to advertise the firm on television after the sale. What was crucial for the Associates was that they would be able to acquire an ownership interest in a hugely profitable firm, even though they did not have either the capital or borrowing power to purchase such a firm from someone else.

I find analogous support for my views about Miles' representations in *American Family Service Corp. v. Michelfelder*, 968 F.2d 667, 671 (8th Cir.1992), in which the Eighth Circuit, applying Iowa law, held that a fraudulent intention not to perform a promised "no shop" clause in a letter of intent supported benefit-of-the-bargain damages. In that case, American Family Service Corp. (AFSC) began negotiating with the defendants to purchase their child care business. When AFSC realized that the defendants were negotiating with another potential buyer, it asked for a guarantee of exclusive bargaining rights. The defendants agreed that they would " 'not negotiate with any other buyer until you have the opportunity to complete your due diligence and a definitive agreement has been achieved.' " *Id.* at 668. This "no shop" clause was included in a letter of intent signed by all parties on June 23, 1989.

Unbeknown to AFSC, the defendants continued to simultaneously negotiate with a third party. When AFSC and the defendants were close to a deal, the defendants abruptly informed AFSC that they were " 'no longer interested in attempting to negotiate the sale of the assets of their child care business.' " *Id.* at 670. A week later, on August 29, 1989, the defendants signed contracts to sell their child care business to a third party.

The jury awarded damages against the defendants for fraud, in the amount AFSC lost in profits that it would have earned had the transaction gone through. There was evidence that the defendants' "paramount concern" was to sell their business during the summer of 1989. *See id.* at 672. The Eighth Circuit characterized this evidence as "demonstrat[ing] that if [the defendants] had dealt exclusively with AFSC as they promised, AFSC would have bought the [defendants']

child care business and benefitted financially from this acquisition." *Id.* at 671. On appeal, the defendants argued that the maximum that the plaintiffs could have recovered was their out-of-pocket expenses while negotiating over the summer of 1989.

The Eighth Circuit rejected this contention, because " '[t]he purpose of the benefit-of-the-bargain rule is to put the defrauded party 'in the same financial position as if the fraudulent representations had been in fact true.' " *Id.* (citations omitted). In reinstating the jury's award, the court pointed to expert testimony that AFSC would have "experienced nearly a $3.5 million increase in net worth inclusive of the transactions costs." *Id.* at 672.

In *American Family,* the benefit-of-the-bargain damage award was sustained notwithstanding the absence of a definite purchase price or any specific terms of purchase, based upon the agreement to negotiate exclusively. Miles' promise to sell to the Associates is analogous to the "no shop" clause in *American Family* in that he certainly promised to offer the firm to them when he decided to retire. Indeed, Miles' representations were more specific than those in *American Family* in that he promised to finance the venture on terms that would allow the Associates to make all payments out of the firm's earnings, to require no money down, and to continue appearing in television advertisements on behalf of the firm.

Because the promise on which the Associates relied was not Miles' tentative agreement to sell for $1.3 million, breach of the bargain damages would not include the difference between $1.7 million sale price and the $1.3 million agreed price, as the Associates, in the alternative, contend. There was no specific price established by Miles when he made his representations to Goldstein and Miles that he would sell them the practice. Although he promised Goldstein that he would sell at a price below fair market value, there was no method for determining how much below fair market value the price would be. Thus, although the Associates could not establish the size of the discount, they at least had the right to purchase the firm for

its fair market value. *See Bohn v. Johnson,* 371 N.W.2d 781, 789 (N.D.1985)(intent to provide buyout price of less than fair market value is enforceable, but fair market value will be used if plaintiff cannot prove lesser price with clear and convincing evidence).

The lack of a definite discount does not mean there was no bargain. As the *Restatement* recognizes,

[a] bargain may be concluded which leaves a choice of terms to be made by one party or the other.... The more important the choice is, the more it is likely that the parties do not intend to be bound until the choice is made. But even on such matters as subject matter and price, one party is often given a wide choice.

*Restatement (Second) of Contracts* § 34 cmt. a. Given the evidence that Miles repeatedly invoked his promise to sell the firm to the Associates, a reasonable juror could find that, despite Miles' "wide choice" concerning the size of any discount, there was an enforceable bargain to sell the firm to the Associates.

As in *American Family,* the absence of a stated price does not preclude formation of a contract. Indeed, it is common for business agreements to set "fair market value" as the purchase price, while providing that determination of that value will be made by a third party appraiser based upon future business conditions. *See, e.g., Dairy King, Inc. v. Kraft, Inc.,* 665 F.Supp. 1181, 1185–87 (D.Md.1987)(buy-back obligation in exclusive distributorship agreement was enforceable contract to purchase company assets); *NBD Bancorp, Inc. v. Fed. Deposit Ins. Corp.,* 643 F.Supp. 1119, 1122–23 (E.D.Mich.1986)(citing testimony by expert appraiser that it is "quite common" for parties in friendly business buy-out to use a fair market value price); *Stephenson v. Drever,* 16 Cal.4th 1167, 69 Cal.Rptr.2d 764, 947 P.2d 1301, 1303–05 (1997)(stock purchase agreement setting price at fair market value, to be agreed upon by parties or determined by appraiser, was enforceable). Disputes over the calculation of the sale price of business assets can be resolved by the fact-finder based on

expert testimony. *See, e.g., NBD Bancorp,* 643 F.Supp. at 1122–23.

The majority also holds that Miles' representations "amounted to no more than statements of intention because they were not "communicated in such a way that the addressee of the expression [could] justly expect performance." I disagree, for two reasons. First, the question of whether it was reasonable to expect performance, and to rely on a employer's representations, is generally a jury question. *See Weisman v. Connors,* 312 Md. 428, 459, 540 A.2d 783 (1988)(in claim for negligent misrepresentation, issues of whether defendant intended that his representations would be acted upon, and whether defendant was justified in relying on them were questions of fact).

Second, the evidence was legally sufficient, in my view, to allow the jury to conclude that Miles intended for the Associates to rely on his representations, for several reasons. Miles only offered the Deal to MacAlister after MacAlister had told him that he had accepted the Gordon, Feinblatt offer, and that an increase in compensation and a promise by Miles to cease his verbal abuse was not sufficient to induce MacAlister to stay with the firm. Moreover, Miles' statements to MacAlister that "[w]e can't operate without you" and the like, reinforced the serious nature of his intent, as did Miles' caveat that his offer was "all subject to [Goldstein's] approval." This signaled to both MacAlister and Goldstein that Miles intended his representations to be treated seriously. Finally, the parties' mutual characterization of their conduct as a "deal" further suggested that they intended to be bound. A lawyer could reasonably rely on these representations from his boss.

I disagree with the majority's view that it is "not just unreasonable, but inconceivable, that experienced lawyers would have relied on such nebulous representations." Like the proverbial shoemaker's children who go without shoes, lawyers often rely upon verbal, imperfectly defined, understandings with their partners, co-shareholders, bosses, and others. The reality is that reducing a verbal agreement to a

written document is difficult and time-consuming. In my estimation, when it comes to writing down a business understanding within a small firm, lawyers are no more diligent than the average business person. Although profits in this firm were very high, it was, indeed, a small firm. Moreover, the parties were not business or corporate lawyers, accustomed to, and adept at, writing buy-sell agreements. They were personal injury trial attorneys, whose success in practice rested on quite different skills.

Nor did the failure of the parties to identify who would be the co-purchaser support the grant of summary judgment. A jury might conclude that Miles' representations that he would sell to the Associates, provided another lawyer was a co-purchaser, included an implied promise that Miles would use reasonable standards in approving the co-purchaser selected by the Associates. Indeed, Goldstein testified in his deposition that Miles promised that he would **not** require that the co-purchaser must bring "financial resources" to the deal. Thus, any competent attorney who could work with Goldstein and MacAlister and help to support the ongoing operations of the firm would satisfy the condition. In addition, there was evidence that Block was acceptable to Miles as co-purchaser, and that Block was willing and able to enter the transaction. Thus, the jury could infer that the condition regarding a co-purchaser was satisfied by the inclusion of Block.

## IV.

### Benefit–Of–The–Bargain Damages Was Appropriate Under These Circumstances

#### A.

#### Benefit–Of–The–Bargain Damages Is Appropriate When The Defendant's Fraud Rendered Out–Of–Pocket Damages Difficult Or Impossible To Prove

Under *Hinkle*, a defrauded plaintiff may recover benefit-of-the-bargain damages if the " 'case is an appropriate one for that treatment.' " *Hinkle*, 262 Md. at 512, 278 A.2d 42

(quoting McCormick, *Damages* § 122). *See also Restatement (Second) of Torts* § 549 cmt. h (1977 & Supp.2003)("*Restatement* ")(benefit-of-the-bargain damages allowed "in any case in which the ... measure can be established by proof in accordance with the usual rules of certainty in damages").

I consider this case an appropriate one for benefit-of-the bargain damages because (1) such damages could be proven with reasonable certainty, and (2) the Associates allegedly suffered injury, but may not have been in a position to prove out-of-pocket losses. As to the first reason, lost profits could be calculated with sufficiency because the Miles firm was an established business with a track record of earnings, and because the Associates largely had been operating the business themselves for several years. According to the Associates' evidence, the only service for which they needed Miles was to continue the television advertising, one of the things he represented that he would do.

The difficulty of proving the exact terms of the promised sale by Miles to the Associates should not deter us under these circumstances. Where Miles' alleged wrongful conduct is the cause of the Associates' difficulty in proving the exact amount of damages, he should not be able to profit from the fraud by requiring such proof with precision, so long as the evidence supports a reasonable inference.

The Associates were not in a position to prove out-of-pocket damages because, had they left Miles, they may have been paid salaries the same as or only marginally greater than what they earned at Miles. This does not mean, however, that they did not suffer damages. They bargained for the prospect of future ownership rights, which would allow them to make substantially more than a salaried employee. It is reasonable to suppose that, if they had worked in another firm, they would have had opportunities to secure ownership positions, as MacAlister would have had if he had gone to Gordon, Feinblatt. The Associates could not prove what they would have earned if they had pursued such other opportunities, however, because that potential was contingent and uncertain. They

were in a much better position to prove what they lost by not having an ownership interest in the Miles firm, which they had been managing and operating successfully for a number of years. *See Restatement §* 549 cmt. g (benefit of bargain damages may be available when plaintiff's out-of-pocket damages are not "just and satisfactory").

## B.

## The Flexibility Rule For Fraud Damages Is Not Limited To Warranty Situations

Miles contends that Maryland courts have only allowed benefit-of-the-bargain damages if the misrepresentation amounted to a warranty, and that we should not extend the rule to a non-warranty situation. Because Miles' promises were not in the nature of a warranty, he argues, the Associates were limited to the "preferred" out-of-pocket damages, which they elected not to prove. Although I have found no Maryland decisions applying benefit-of-the-bargain damages in a non-warranty fraud case, neither do I see any intent on the part of the Court of Appeals to impose such a limit. Moreover, as I set forth below, at least five jurisdictions, seemingly a majority, have taken this approach. I am aware of only one jurisdiction holding that benefit-of-the-bargain damages are limited to cases involving a "warranty of value." *See Staley v. Taylor,* 165 Or.App. 256, 994 P.2d 1220, 1225 (2000).

Miles relies on *Hinkle's* adoption of the "four rules" from the seminal case of *Selman v. Shirley,* 85 P.2d at 394, which I set forth in Section I. He views the second of these rules, providing that "if the fraudulent misrepresentation also amounted to a warranty, recovery may be had for loss of the bargain because a fraud accompanied by a broken promise should cost the wrongdoer as much as the latter alone," as limiting benefit-of-the-bargain damages to warranty cases. Both *Selman* and *Hinkle* involved alleged fraudulent representations by the seller of goods to the buyer, about the

condition or quality of those goods, and thus the courts were focused on representations in the nature of a warranty.

The rationale of the benefit-of-the-bargain rule, *i.e.*, that a fraud plus a broken promise should cost the wrongdoer as much as a broken promise alone, is equally applicable, however, when the promise is something other than a warranty. The *Restatement (Second) of Torts* section 549 does not limit out-of-pocket damages for fraud to warranty cases. It also follows the flexible rule, "giving the plaintiff the option of either the out-of-pocket or the benefit-of-the-bargain rule in any case in which the latter measure can be established by proof in accordance with the usual rules of certainty in damages." *Restatement* § 549 cmt. h. The *Restatement* phrases the rule as follows:

(1) The recipient of a fraudulent misrepresentation is entitled to recover as damages in an action of deceit against the maker the pecuniary loss to him of which the misrepresentation is a legal cause, including

(a) the difference between the value of what he has received in the transaction and its purchase price or other value given for it; and

(b) pecuniary loss suffered otherwise as a consequence of the recipient's reliance upon that representation.

(2) **The recipient of a fraudulent misrepresentation in a business transaction is also entitled to recover additional damages sufficient to give him the benefit of his contract with the maker, if these damages are proved with reasonable certainty.**

*Restatement* § 549 (emphasis added). Notably, the *Restatement* refers to "business transaction," and nothing is said to suggest that benefit-of-the-bargain damages are limited to sales of personalty or realty with a warranty.

A comment to subsection 2 explains that out-of-pocket damages are sufficient in many circumstances, but are often not "just and satisfactory" when the plaintiff has entered a business transaction with the defendant:

> When the plaintiff has made a bargain with the defen-
> dant, ... situations arise in which the rules stated in
> Subsection (1) ... do not afford compensation that is just
> and satisfactory. If the value of what the plaintiff has
> received from the defendant is fully equal to the price he
> has paid for it or other value he has parted with and he has
> suffered no consequential damages, he may be unable to
> recover at all under the rules stated in Subsection (1). **He
> may nevertheless be left with something acquired under
> the transaction which, because of the matter misrepre-
> sented, he does not want and cannot use. He may have
> lost the opportunity of acquiring a substitute at the
> same price and because of his commitments made or
> expenses incurred or for a variety of other reasons he
> may find rescission of the transaction and recovery of
> the price paid and unsatisfactory and insufficient reme-
> dy.** In this case, under the rules stated in Subsection (1),
> the defrauding party would escape all liability.

*Restatement* § 549 cmt. g (emphasis added). Again, there is
no suggestion that the business transaction must be a sale that
involves a warranty.

In approving a floor covering distributor's recovery of lost
profits when a manufacturer fraudulently represented that the
distributor would have an exclusive distributorship for the
state, the Supreme Court of Iowa relied on the *Restatement* to
explain its holding:

> When the plaintiff has no out-of-pocket losses, the benefit-
> of-the-bargain rule must apply, otherwise
>
>> the defrauding defendant has successfully accomplished
>> his fraud and is still immune from an action in deceit....
>> This is not justice between the parties. The admonitory
>> function of the law requires that the defendant not escape
>> liability and justifies allowing the plaintiff the benefit of
>> his bargain.

Restatement (Second) of Torts § 549 cmt. i, at 115 (1977).
Thus, a defrauding defendant will not be heard to say that
its intentional misrepresentations were not the cause of any

damages to the plaintiff because the plaintiff was not out anything. The public policy as stated in the above quotation from the Restatement will allow a factfinder to find a causal connection between the misrepresentations and injury by holding the defendant to what it has represented to the plaintiff. For this reason, the benefit-of-the-bargain rule and the causation analysis are inextricably intertwined.

*Midwest Home Distrib., Inc. v. Domco Industries, Inc.,* 585 N.W.2d 735, 739–40 (Iowa 1998).

At least five jurisdictions have allowed benefit-of-the-bargain damages in cases in which the fraudulent misrepresentation did not involve a warranty. *See American Family,* 968 F.2d at 671 (applying Iowa law, court upheld jury's benefit-of-the-bargain damages award for fraudulent misrepresentations regarding intent to bargain exclusively in negotiating purchase agreement with plaintiffs); *Laney v. American Equity Inv. Life Ins. Co.,* 243 F.Supp.2d 1347, 1355–56 (M.D.Fla.2003)(applying Florida law, court held plaintiff was entitled to recover benefit-of-the-bargain damages for brokers' fraud in churning account); *Midwest Home Distrib., Inc.,* 585 N.W.2d at 739–42 (Iowa 1998)(distributor entitled to benefit-of-the-bargain damages consisting of lost profits when manufacturer fraudulently represented that distributor would have exclusive distributorship for state); *McConkey v. Aon Corp.,* 354 N.J.Super. 25, 804 A.2d 572, 588 (App.Div.2002), *cert. denied,* 175 N.J. 429, 815 A.2d 476 (2003)(upholding benefit-of-bargain damages for fraudulent representations regarding defendant company's current business plans, made to executive to induce him to accept employment contract with defendant); *Formosa Plastics Corp. USA v. Presidio Engineers and Contractors, Inc.,* 960 S.W.2d 41, 50 (Tex.1997)(benefit-of-the-bargain damages in the form of lost profits appropriate if defendant made fraudulent misrepresentation that plaintiff contractor would have control of delivery of the concrete necessary for the project, that induced plaintiff to contract at low bid price). Indeed, one of these cases explicitly rejected the precise argument that Miles makes here, finding it "without merit." *See McConkey,* 804 A.2d at 589.

It is impossible for the Associates to seek rescission of the contract and recovery of the price paid, because the price allegedly paid was years of dedicated service to Miles, which cannot be recovered. As I indicated above, the Associates allegedly lost the opportunity to acquire an ownership interest in another profitable firm through years of service because of the Associates' reliance on Miles' misrepresentations.

In sum, the Court of Appeals in *Hinkle*, in adopting the flexibility rule and applying it to a warranty case, did nothing to suggest that it could not be applied in other contexts. The *Restatement* and the cases listed above have applied that rule in a broad spectrum of cases outside the warranty context. The rationale for the rule is equally applicable in these other contexts. I consider this rationale and these authorities persuasive, and therefore would hold that a fraudulent misrepresentation of a party's intent to perform a contract, including one of the sort alleged here, can give rise to benefit-of-the-bargain damages.

## V.

### Benefit–Of–The–Bargain Damages Can Be Recovered In Actions For Negligent Misrepresentation

The trial court granted summary judgment on the Associates' counts for negligent misrepresentation and for fraudulent misrepresentation for the same reason: that they could not rely on benefit-of-the bargain damages.[28] We have previously held that a plaintiff in a negligent misrepresentation case also has the choice of out-of-pocket or benefit-of-the-bargain damages. *See Ward Dev. Co. v. Ingrao*, 63 Md.App. 645, 659, 493 A.2d 421 (1985)("We perceive no reason why th[e] flexible approach should not be applied to cases of negligent as well as fraudulent misrepresentation"). Thus, I would hold that the trial court erred in granting summary judgment on the negli-

---

**28.** At the second hearing on the motion for summary judgment, when the court added the failure to show fraudulent intent as an alternative ground for its decision on the fraud count, it did not mention any alternative ground for the negligent misrepresentation count.

gent misrepresentation count for the same reasons set forth in the previous sections. I do not address whether the trial court could have granted summary judgment on the negligent misrepresentation count for other reasons.

## Conclusion

For the reasons stated above, I would reverse the circuit court's order granting summary judgment in favor of Miles, and remand for further proceedings consistent with this opinion.